827 So.2d 508 (2002)
STATE of Louisiana, Appellee
v.
Demetric GILLIAM, Appellant.
No. 36,118-KA.
Court of Appeal of Louisiana, Second Circuit.
August 30, 2002.
Rehearing Denied October 17, 2002.
*509 Louisiana Appellate Project, by Carey J. Ellis, III, Abita Springs, for Appellant.
Demetric Gilliam, Pro se.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, J. Thomas Butler, Dale G. Cox, Traci A. Moore, Assistant District Attorneys, for Appellee.
Before BROWN, STEWART and PEATROSS, JJ.
STEWART, J.
Demetric Gilliam was convicted of first degree murder, and sentenced to life imprisonment, without benefit of probation, parole, or suspension of sentence, from which he now appeals. Based on the following, we affirm the defendant's conviction and sentence.

FACTS
This case involves the murder of a three-year-old child and the injury of his month-old sister. Pursuant to La. R.S. 46:1844(W), the murder victim's initials, K.B., and his sister's initials, J.B., will be used.
On August 18, 1998, Eric Calhoun and Tyrell Odell went to visit Odell's three-year-old son, K.B. at the home of the child's mother, Teresa Bryant. Bryant also had an eight-month-old daughter, J.B., who was not related to Odell. Odell was driving his girlfriend's car, a burgundy Mitsubishi Galant. Odell planned to take K.B. to get a haircut. Bryant and the children got into the car with Odell. J.B., was in her mother's lap in the front seat. K.B. was in a child seat in the back seat along with Calhoun.
Odell made several stops, to either McDonald's or Burger King, then to the barber. After the barbershop, Odell began riding around the Queensboro neighborhood, looking for marijuana. Bryant testified that Odell smoked a "blunt," a cigar laced with marijuana. Odell's car was spotted by the defendant, Larry White, and the defendant's brother, Terrance Gilliam. There was apparently an ongoing feud between Odell and the defendant. In his August 19, 1998, statement to the police Gilliam said that the week before, Odell had stolen $10,000.00 from him and Larry White during a dice game. Gilliam later told the police that he and White had called Odell and demanded he return the money, but that he only laughed at them.
Gilliam and his friends apparently swapped cars and began following the car driven by Odell. At the corner of Hollywood Avenue and Union Street, Odell pulled into the Hollywood Liquor Bank to get drinks for the children, and a cigar for himself. There is some conflict as to whether Calhoun got out with Odell. Bryant testified Calhoun did get out. Calhoun testified he did not. Nonetheless, while Bryant waited with the children, K.B. got out from his car seat to retrieve the toy car he had gotten with his hamburger.
When Odell got back into the car and was pulling out of the parking lot, his car was hit from behind by the car containing the defendant, Larry White, and Terrance Gilliam. The defendant had armed himself with a .45 caliber semi-automatic pistol, Larry White had a 12-gauge pump shotgun, and Terrance Gilliam used a AK-47. Odell testified that as his car was hit, he *510 looked back and saw the defendant getting out and firing into Odell's car with the pistol. Odell did not know the defendant's name, but recognized him as someone he knew in the neighborhood by the street name of "Red."
The defendant was quickly joined by White and Terrance Gilliam, who also began firing into the Odell car. The defendant later provided a statement to police that after he emptied his pistol, he took the AK-47, and began firing it into the Odell car.
All of the adults in the Odell car were struck by a combination of rifle and pistol bullets, and shotgun pellets. As the shooting started, K.B. apparently tried to stand up to see what all the noise was about. Bryant tried to cover up J.B., and Calhoun tried to cover up K.B. Odell testified that as the shooting continued, he realized that he was the target of the shooting, and decided to leave the car to protect his son. Odell had already been shot several times, including in his right arm. At about the time Odell was exiting the car, K.B. was struck in the back of the head by a bullet. Forensic testimony indicated that it was most likely a bullet from the AK-47 that had lost energy passing through the windshield and a car seat. As a result, the bullet entered into back of the child's head, disintegrated on impact, and did not exit. The child died almost instantly.
Odell had difficulty running because his disabled arm caused him to stumble and fall. As Odell ran, the defendant shot him twice more in the legs and hip. Odell crawled to a porch of a house on Hollywood Avenue and passed out. By the time the defendant, White, and Terrance Gilliam finished shooting, they had fired at least 30 rifle, pistol, and shotgun rounds into the Odell car. Odell was hit at least eight times, in the arms, legs, chest, head and hips. Calhoun was shot multiple times. Bryant was shot twice in the chest and in the mouth. J.B. was shot in the left arm. As the shooting ceased, and the gunmen fled, Bryant fled the car, and gave J.B. to a bystander while she attempted to find a phone.
The shooting was witnessed by several eyewitnesses. Kevin Joseph was a security officer with the Caddo Parish School Board who was driving by when the shooting started. Joseph was a veteran of Desert Storm, and recognized the various types of firearms being used in the shooting. He did not know any of the men shooting, but testified that the defendant was not the man he saw firing the AK-47. After the shooters fled, Joseph went and got two Shreveport Police Officers who arrived within minutes of the shooting.
Ryan Perkins was 13 years old at the time of the shooting. He was in a car riding down Hollywood when he saw two or three men shooting into the Odell car. Perkins testified he watched as the men shot into the car, and Odell ran in front of the car in his attempt to flee the shooting. After the shooters left, Perkins was one of the first ones to arrive at the Odell car. He saw that K.B. was dead. He also testified that he saw Calhoun inside the car, injured.
Frankie McLemore Hunter worked at the Shreve Memorial Library at the corner of Hollywood and Union. She testified she was getting out of her car and watched as the two cars collided, and a man immediately got out of the rear car and began firing a long gun at the burgundy Galant. The Galant began spinning around. Next, a gunman got out of the driver's side of the rear car and began firing a shorter gun at the Galant. As he ran out of bullets, he ran across the street, and out of sight. As Odell ran from his car, Hunter watched the gunman with the long gun *511 start shooting at Odell. As he was doing so, Hunter saw Bryant run from the car, holding J.B. In a subsequent photo lineup, Hunter did not identify the defendant as one of the gunmen.
Eric Calhoun testified that he was in the back seat with K.B. when the shooting started. He looked back and saw the defendant standing beside the driver's side door of the rear car, firing a pistol towards them. Calhoun testified that as he attempted to cover K.B. on the floorboard, he was shot in the left elbow, causing him to lose control of the child. At that point, the child jumped up, holding onto the back of the headrest, and was hit with a bullet, and fell back onto the rear seat.
Calhoun also testified that he jumped out of the car to run, but fell onto the ground. He testified that after he fell, the defendant stood over him and demanded that he turn over. Calhoun could not turn over because of his injuries. The defendant then shot Calhoun twice, once in the side and once in the rear end. That bullet lodged an inch from his spine.
Officer Allen Crump, of the Shreveport Police Department, testified that he was at a seminar at the nearby Caddo Parish School Board office, when he was notified of the shooting. He quickly arrived at the scene and found the injured Calhoun sitting in the burgundy Galant, with his feet on the ground, and K.B. sitting in the car, dead. A young lady was holding an infant female near the car. Officer Crump secured the scene and located evidence.
Sharika Harvey lived with Terrence Gilliam on August 18, 1998. She testified that the defendant came to her home on Alma Street on August 19, 1998, stating he needed to change and wash clothes. While the defendant was in her home, the Shreveport Police came to her home looking for him. She told the officers that the defendant was in her home. She allowed the police into her home, where they found the defendant hidden in her attic. The car used in the August 18, 1998, shooting was found in her backyard, covered with a tarp. At trial, Harvey denied telling Detective Monet of the Shreveport Police Department that the defendant had also told her that he was leaving town. She also testified that a "Donald," a friend of the defendant, drove the defendant's car to her house.
Sergeant Mile Kellum, with the Shreveport Police Department testified that on August 19, 1998, he received an anonymous phone call stating that the "Red" involved in the August 18, 1998, shooting was inside a green house in the 1600 block of Alma Street. When Kellum arrived at that house, he saw a black male with a large garbage bag of items, near the trunk of a Ford Thunderbird. At trial, Kellum identified that male as the defendant. The defendant walked briskly back into the green house. Kellum testified that the lady who lived at the house (Harvey), let them into the house, where they found the defendant.
Detective Donna Lott, with the Shreveport Police Department, testified that she was the lead detective in the investigation of the August 18, 1998, shooting. She testified that she had developed leads that the defendant was a suspect in the case. She also testified that after the defendant was arrested on August 19, 1998, she read the defendant his Miranda rights from a card that the defendant signed after telling her he understood his rights. Thereafter, she conducted a taped interview of the defendant. The tape of that interview was played to the jury, without objection by the defendant.
After his arrest, the defendant gave a statement to the police. The evidence indicates he did so after he had been fully *512 advised of his rights. The defendant on appeal does not assert his statement was improperly obtained. In his August 19, 1998, statement, the defendant admitted to shooting into the burgundy Galant. The defendant told the police that Odell and Rufus White had robbed him earlier. On August 18, 1998, he, Larry White, and a "Fred" saw Odell drive by. The defendant stated he thought Odell and Rufus White were in the car, but the car windows were tinted where he couldn't see into the car. The defendant followed and pulled up behind the parked Odell car. The defendant stated that Odell backed his car into the defendant's and began firing first. The defendant stated that he got out with a .45 caliber pistol and shot into the burgundy Galant with the intent to hit Odell and Rufus White. He shot the pistol left-handed, and when it was emptied, he began firing an AK-47 assault rifle into the car. He stated Larry White was firing a shotgun, but that "Fred" ran away.[1] The defendant stated that after the shooting, he dropped Larry White off at home, and then threw the firearms away.
Thereafter, on August 21, 1998, the defendant made a second statement to Detective Lott. In this statement, the defendant again told Detective Lott that he was carrying the guns in the car because he was looking for Odell and Rufus White. He thought it was Tyrell Odell and Rufus White in the car, and he had intended to shoot them both. The defendant drew a diagram of the position of the cars at the scene of the shooting. The defendant told her that as the burgundy Galant was backing up, he jumped out of his car and began shooting into the car.
Lelia Hart testified that in August 1998, she was employed with the Caddo Parish Coroner's Office. She testified that she transported the metal bullet fragments taken from K.B.'s head by Dr. McCormick, to the crime lab.
Richard Beighley, with the North Louisiana Crime Lab, testified that he was the firearms section supervisor. He was qualified as an expert in firearms identification matters. Beighley rendered an opinion that the bullets fired from the AK-47 could have penetrated the body or windshield of the car, and that the bullet fragments recovered from K.B.'s head indicated that the bullet had struck something, causing it to fragment before it hit the child's head. Beighley also found bits of foam on one fragment, indicating that the bullet may have also penetrated the headrest on the seat of the car. Beighley excluded the possibility of the fragments being from a .45 caliber pistol bullet.
Detective Anthony Rei, with the Shreveport Police Department, testified that he was present, with Detective Lott, when the defendant was interviewed on August 19, 1998. He testified that the defendant willingly waived his rights and gave a statement, which was tape recorded. He further testified that he was also present, with Detective Lott, when the defendant gave his second statement. Rei testified that the defendant willingly waived his rights before giving the statement. Rei also testified about his examination of the crime scene, and identified photos of the crime scene.
Dr. Erringon C. Thompson, M.D., testified about his treatment of the injuries received by J.B., her mother Theresa Bryant, Eric Calhoun, and Tyrell Odell. *513 Dr. Thompson testified that J.B. received a non-life threatening wound to her left arm. Theresa Bryant was treated for a gunshot wounds to the mouth, and to the chest, resulting in a collapsed lung. Calhoun suffered gunshot wounds to his left elbow and hand, and his right buttock. Odell suffered from multiple gunshot wounds to his buttocks, both legs, knees and ankles.
Dr. George McCormick, II, M.D., testified about the autopsy of K.B. He testified that the child had been killed by a glancing gunshot wound to the back of his head, causing a large hole in the top of the head, multiple fractures along the skull, and severe hemorrhage around the brain, causing the child's death. Dr. McCormick testified about removing bullet fragments from the child's brain.
Lieutenant Mark Rogers, with the Shreveport Police Department, testified that he was the commander of the crime scene investigation unit which investigated the shooting. He was qualified as an expert witness in crime scene analysis and crime scene reconstruction. Rogers testified about the pattern of bullet impacts onto the burgundy Galant. He testified that the car was hit by several different guns and the shooters' positions moved, relative to the car. All of the bullet holes indicated shots fired into the car. Rogers found no bullet holes indicating firing from the inside of the car.
After hearing the evidence, the jury convicted the defendant of first degree murder. The transcript of the sentencing phase of the trial is not part of the record, but the record reflects that the jury could not reach a verdict on the death penalty, and was discharged. The defendant timely filed a Motion for New Trial and a Motion for Post-Verdict Judgment of Acquittal, asserting insufficient evidence, which was denied by the trial court. On August 20, 2001, the defendant was sentenced to life imprisonment, without benefit of probation, parole, or suspension of sentence. This appeal followed.

DISCUSSION

Sufficiency of the Evidence
The defendant argues that the evidence does not prove, beyond a reasonable doubt that the defendant fired the shot that killed K.B., and that when he shot into the car, he had the specific intent to kill more than one person.
The state argues that the evidence was sufficient to convict the defendant of first degree murder, even if the evidence showed that the defendant did not actually fire the shot that killed the child. La. R.S. 14:30 provides, in pertinent part:
A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnaping, second degree kidnaping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, drive-by shooting, first degree robbery, or simple robbery.
* * *
(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.
* * *
(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age *514 of twelve or sixty-five years of age or older.
La. R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
The defendant filed one assignment of error, challenging the sufficiency of the evidence in convicting him of first degree murder of a three-year-old child, K.B. The defendant does not dispute that he, along with at least three confederates, indiscriminately fired numerous times into an automobile with five passengers, one of which was the child. The day after the shooting the defendant admitted to police emptying a .45 caliber pistol into the car, then picking up an AK-47 assault rifle and firing it into the car. The child was killed with a bullet into the back of his head of the type fired from an AK-47 assault rifle. No other eyewitness testified about seeing the defendant firing the assault rifle. The defendant argues that the lack of evidence that the defendant fired the fatal shot results in insufficient evidence to convict the defendant of first degree murder.
The standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333. The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
The defendant was convicted of first degree murder of a three-year-old child. The defendant was convicted pursuant to La. R.S. 14:30(A)(3), "When the offender has the specific intent to kill or inflict great bodily harm on more than one person."
The evidence the jury heard shows that the defendant, and others, had an ongoing dispute with Tyrell Odell and Rufus White. The defendant and at least two others were driving around armed, looking for Odell and Rufus White to shoot them. On August 18, 1998, the defendant and his confederates saw the car driven by Odell, and followed it. According to the testimony of Theresa Bryant, a passenger, a victim, and the mother of K.B., both Odell, and Eric Calhoun got out of the car at a time they would have been seen by the defendant. The defendant told the police afterwards that he believed Odell and Rufus White were in the car, and intended on shooting them.
After the shooting began, the evidence indicates that Odell, and possibly Calhoun, attempted to flee from the car, and both were shot. Although none of the other eyewitnesses supported Calhoun's story that he had left the vehicle, Calhoun's injuries support his story that after *515 the defendant had shot at the fleeing Odell, he then shot a prostrate Calhoun in the back side. The defendant and his confederates fired at least 30 rifle, pistol, and shotgun rounds into the car and at fleeing victims. The shooting was indiscriminate, and at close range, and leaves no doubt that the defendant knew that he was shooting at more than one person when he fired into the stopped automobile. The jury was free to believe witnesses that supported this fact. This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir. 1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra.
The defendant argues that he did not know the child was in the car, was not shooting at the child, and was not firing the weapon that hit the child. There are at least two defects in this argument. First, the defendant overlooks that fact that the jury heard his statement that he had also fired the assault rifle that ultimately killed the child. Second, the defendant overlooks the law regarding principals to a crime. La. R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
By any legal definition, the defendant was a principal in the indiscriminate shooting into a car with the specific intent to kill or cause great bodily harm to the occupants. Consequently, there was sufficient evidence for the jury to find the defendant guilty of first degree murder. As recently stated by the Louisiana Supreme Court:
A person may be convicted of an offense even if he has not personally fired the fatal shot. The law of principals states that all persons involved in the commission of a crime, whether present or absent, are equally culpable. See La. Rev Stat. 14:24. However, the Defendant's mere presence at the scene is not enough to "concern" an individual in the crime. State v. Schwander, 345 So.2d 1173, 1174-1175 (La.1977). A principal may be connected only to those crimes for which he has the requisite mental state. State v. Holmes, 388 So.2d 722 (La.1980); State v. McAllister, 366 So.2d 1340 (La.1978).
State v. Hampton, 98-0331 (La.4/23/99), 750 So.2d 867, 880, certiorari denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999), rehearing denied, 528 U.S. 1108, 120 S.Ct. 855, 145 L.Ed.2d 721 (2000). Whether the defendant actually fired the bullet that struck and killed the three year old victim is of no consequence.
Moreover, there was sufficient evidence to find him guilty of first degree murder under the doctrine of "transferred intent." In State v. Strogen, 35,871 (La. App.2d Cir.4/3/02), 814 So.2d 725, the defendant Strogen was convicted of second degree murder based on the transferred intent doctrine. The transferred intent doctrine as set forth in Strogen, states:
When a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or inflicting of great bodily harm would have been unlawful against the intended victim actually intended to be shot, then it would be unlawful against the person actually shot even though that person was not the intended.
In Strogen, the Court found that the defendant had the specific intent to seriously injure or kill one person, but accidentally killed another person. The Court applied *516 the doctrine of transferred intent, finding that the requirement of specific intent to kill was met and transferred to the actual victim. Thereafter, the defendant was found guilty of second degree murder.
In the instant case, the defendant admitted searching for the two intended victims with the intention of shooting them. He then proceeded with his cohorts to fire into a vehicle containing at lest one of his intended victims. The defendant admitted to firing the AK-47 that was used to kill the victim. Under the doctrine of transferred intent, even if the defendant intended to kill another person and not the actual victim, he is still guilty. We find no error in with the trial court's decision.

CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, STEWART, CARAWAY, PEATROSS, and DREW, JJ.
Rehearing denied.
NOTES
[1] There is no other evidence of "Fred," and the defendant could not provide a last name for Fred, and the only description he could give the officers was that Fred was "long-haired and ugly." It appears that the defendant was trying not to implicate his brother, Terrance Gilliam.