PEATROSS, J.
| defendant, Tommy Hendry, was convicted of malfeasance in office, a violation of La. R.S. 14:134, and he was sentenced to three years at hard labor. Defendant now appeals. For the reasons stated herein, we affirm.
FACTS
Defendant was the chief of police of Baskin, Louisiana, at the time of the alleged offense. As discussed in detail below, Defendant allegedly intimidated a clerk at a convenience store in Baskin into selling beer to a young friend of his who was 19 years old at the time. As a result, Defendant was charged with malfeasance in office. Defendant was subsequently found guilty by a six-person jury and sentenced to imprisonment for three years at hard labor.
An amended bill of information was subsequently filed on January 30, 2007, alleging that Defendant committed malfeasance in office:
by permitting the unlawful sale of alcohol to Travis Blackmon, a person known by the defendant to be under the age of 21 in violation of R.S. 14:93.11 and by aiding or facilitating Travis Blackmon in the purchase and possession of alcoholic beverages in violation of R.S. 14:93.12, on or about September 13, 2005.
The State’s first witness at trial was Fred Laing, an investigator for the Louisiana Office of Alcohol and Tobacco Control (“ATC”), who testified that he had received a call from the Baton Rouge ATC Office to investigate a complaint and that he also had received an e-mail from the State Police that, in turn, had been received from Ken Boothe of KNOE News. The complaint was that Defendant had purchased beer for Blackmon and, later that day, was also present when Blackmon purchased beer. Over objection, Laing’s testimony was used to introduce into evidence ^Defendant’s oath of office. Laing indicated that he interviewed Crystal Phillips and Mariah Adams, who were clerks at the store at the time of the incident. Laing also interviewed Travis Blackmon.
After his investigation, Laing obtained a warrant and arrested Defendant on January 6, 2006. Laing testified that Blackmon was also arrested for purchase and possession of alcohol by a person under 21 years of age and that Laing believed Blackmon pled guilty. On cross-examination, Laing stated that he never spoke to Defendant.
*354 The next witness was Misean Haywood who had worked at the convenience store, but she was not present on the day of the incident. Haywood testified that a day or so before the incident she had refused to sell alcohol to Blackmon when he came into the store and put some beer on the counter. According to Haywood, she and Mariah Adams had told Blackmon they would not sell beer to him because he was underage. Blackmon then said, “Don’t make me go get the big man to come and get it for me.”[1]
On cross-examination, Haywood stated that she did not remember seeing a note on the registers at the store stating not to sell alcohol to Blackmon and another individual. She indicated, however, that she was not saying such a note was not there, but only that she did not remember such a note. She also denied knowing that Black-mon had purchased alcohol at the store many times before.
IsMariah Adams testified next and stated that the day before the incident she was working at the store with Misean Haywood when Blackmon attempted to buy beer. She confirmed Haywood’s testimony that they refused to sell him the beer and stated that he said he would be back later “with the big man.” Adams knew Black-mon was underage because Ms. Stewart, the store owner, had put notes on both registers saying not to sell alcohol to Blackmon or Zack Williamson.
Adams was working in the store the next day with Crystal Phillips at the time of the incident. Adams stated that, around 7:00 p.m., Blackmon and Defendant arrived together in Blackmon’s truck. Both men got alcohol and came to the counter. Defendant went to the register where Phillips was working, while Black-mon went to the register where Adams was working. Phillips asked Defendant if the purchases were together and he responded, “No, he’s paying for his.” Adams testified, “And I — I just kept standing there and he [Defendant] looked over at me and said ‘Are you going to ring him up or not?’ ” Adams then rang Black-mon up, the men left the store, got into Blackmon’s vehicle and went to Defendant’s house, which was right across the street from the store. Adams testified that, when Defendant spoke to her, “I felt intimidated, it was the Chief of Police telling me to ring up a 17 year old for alcohol.” Adams concluded her direct examination testimony by admitting that she had been convicted of theft of utilities a couple of months before the incident. She also testified that she had no grudge against Defendant, and related that she was fired the day after the incident.
|4On cross-examination, she admitted that her firing had nothing to do with the incident. Instead, she said she was fired because of the effects of medication she was taking that made her forget things and be in a fog. She admitted that she never told Laing that Defendant had asked if she was going to ring Blackmon up. In fact, she told Laing that Defendant never said a word to her, nor did she mention it to Spencer Harp, a Baskin policeman with whom she had talked about the incident. She had claimed that Defendant looked at her and she had felt intimidated, so she rang up the purchase for Blackmon. She also admitted that, at the time of the incident, Defendant was not in uniform and was not on duty. She further admitted that she had not told either Laing or Harp about Blackmon coming in the previous day and that she had gotten confused about what Defendant had purchased because he had come into the store earlier on the day of the incident. Additionally, she *355 admitted that Blackmon had purchased alcohol at the store in the past and that she had sold it to him.
On redirect, the State attempted to rehabilitate this witness somewhat by getting her to testify that Harp had questioned her about what happened, but it was not part of any “official investigation” and that Harp had not asked detailed questions. She also testified that Laing’s interview was not as detailed as her trial preparation. She stated that, although she took Ativan for anxiety attacks, she was “totally sober” at the time of the incident.
Crystal Phillips, the other clerk at the store on the evening of the incident, testified next. She testified that Defendant and Blackmon arrived | fin Blackmon’s truck between 7:00 and 8:00 p.m. She knew Blackmon was not able to purchase alcohol because of the sticky notes on both registers saying not to sell alcohol to Blackmon or Zack Williamson. Blackmon got a case of Bud Light and Defendant got a six pack of wine coolers; Blackmon went to the register where Adams was, while Defendant went to Phillips’ register. Phillips asked Defendant if he was going to buy both, and he said that he was only going to buy the six pack. Phillips then testified, “I was like ‘okay’ so I rang him up and we just sit — stood there, me and Mariah did, just looking at each other like ‘what — what are we going to do?’ you know. Well, we sat there for a few minutes and he [Defendant] looked at her and he goes ‘Well, are you going to ring him up or not?’ So she rang him up and they left.” Phillips also indicated that Blackmon’s truck “was always at his [Defendant’s] house.” A week or so later, Phillips talked to Harp about the incident when she “just brought it up in conversation.” Later, she was interviewed by Fred Laing, but she maintained that she did not make the complaint that caused the investigation.
On cross-examination, Phillips admitted that she did not tell either Laing or Harp about Defendant allegedly saying, “Are you going to ring it up or not?” She also admitted that she had asserted that earlier the day of the incident Blackmon and Defendant had come into the store. She testified that she was sure that, on the earlier occasion, it was Blackmon with Defendant and not Willie Ray Lewis. She, like Adams, admitted that, at the time of the incident, Defendant was not in uniform and was not on duty. She testified that she had quit her job at the store, and she indicated that she |(iknew Blackmon had purchased beer at the store many times in the past, although she denied selling beer him. On redirect, the State asked questions, as it had done with Adams, to show that Laing’s interview was not as detailed as the State’s interview in connection with the trial.
The State’s last witness was Blackmon, whom the State apparently thought was going to testify favorably about how the incident occurred. Blackmon’s testimony as to his birth date (4/7/86) established that he was about 19½ years old at the time of the incident. He indicated that he had known Defendant for three or four years and he and Defendant were friends, although he denied they were close friends.
Defendant further testified that, on the day of the incident, they had been working-on a truck and, during the evening, they went to the store in his truck. Defendant went in and bought a case of beer. According to Blackmon, as Defendant was checking out, Blackmon went in the store and also bought a case of beer, which he put in the bed of the truck. Blackmon also testified that he had no problem buying the beer and was not asked for ID. He *356 further stated that, at the time he was checking out, Defendant had already gone to the truck. Blackmon indicated that he did not go into the store at the same time as Defendant because Blackmon was either talking to someone in the parking lot or talking to someone on the phone. Blackmon also testified that, after buying the beer, he drove across the road and let Defendant out at his house.
Blackmon indicated that, because of the way he had parked his truck at the store, Defendant did not see Blackmon with the case of beer. He was |7then asked if he knew what perjury was, and he responded, “It’s failure to tell the truth.” He then related that he told the same story to Wyatt Lobrano (whose title is never revealed), who investigated the incident, and that Lobrano “then committed to telling me his story of what he thought was the truth and if I didn’t agree with that story that he was going to revoke my probation if I didn’t agree with his story, and I’m telling you the truth.”[2] Blackmon testified that he agreed with Lobrano’s story so that he could leave, but that he was telling the truth in court because he was under oath. He said that he had not talked to either Defendant or his attorney and that they had no idea what he was going to tell the jury.
During his testimony, Blackmon admitted that he was 19 at the time of the incident. The following colloquy then took place:
Q. Was Tommy Hendry aware of your age?
A. I — I don’t know. I’ve been buying
Q. He knew how old you were, didn’t he?
A. Yes, sir, I’ve been buying beer in Baskin since I was ten years old.
Q. Okay. And Tommy Hendry knew that? He’d have to, you were good friends ...
A. Yes.
Q ... .right?
A. Yes.
Q. So Chief Hendry didn’t have an objection to you buying beer, is that correct?
|SA. He didn’t buy the beer, I did.
Q. That’s what I’m saying ...
A. But, no ...
Q. ... he didn’t have a problem with you buying beer at Stewart’s or wherever, is that right?
A. Right.
Blackmon testified that he never had problems purchasing alcohol when he was under 21 and there was no reason that he would need Defendant to help him get alcohol. When asked if Defendant ever knew whether he purchased beer, Black-mon responded, “Well, he knowed I drank beer.” When asked if Defendant ever was in a store at the time Blackmon purchased beer, however, Blackmon responded in the negative. He also testified that he was in the store only once on the day of the incident.
On redirect, the questioning returned to whether Defendant knew, after becoming Chief of Police, that Blackmon bought beer in Baskin. The best the State could get from him, however, was that “everybody around there knows I buy beer,” and that he had never tried to hide it from anybody. When asked to confirm that Defendant knew he purchased beer, he responded, “Well that would be to his knowledge, not mine.” When asked to confirm that De *357 fendant did not have a problem with him buying beer, he responded, “Not to my knowledge, he never said nothing to me about it.” Blackmon stated that he had bought beer at the store probably 50 to 100 times. He said he had never been refused until the day after the incident. He admitted that he was upset when he was refused and “said a |flfew choice words” before leaving. He admitted he knew it was illegal for him to purchase and possess alcohol.
The first defense witness was Beverly Stewart, the store owner. She testified that Mariah Adams was no longer working at the store because “she was taking medicine and she wasn’t able to work when she took it, she was out of it.” Stewart indicated that Crystal Phillips did not work at the store because “she was unreliable and she would call in a lot, and she wouldn’t show. She did have children and I understand that, but she just wouldn’t come in.” Stewart testified that she never knew about the incident at the store until Fred Laing came to see her about it in the first part of 2006. She also indicated that she knew Defendant and that she had never known him to buy any alcohol other than beer.
On cross-examination, she stated that she was appearing in court voluntarily. She also stated that she did not know of Blackmon buying beer at her store 50-100 times; she disputed that claim, but admitted that she once sold him beer before finding out that he was under age and that, afterward, she put a note on the registers that he was not allowed to buy beer. She was asked when this occurred in relation to the incident, and she replied, “Seems like it was several weeks.” When asked if she spent a lot of time at the store, she responded, “I live there just about.” She testified that, after getting to the store early in the morning, she usually left about 2:30 or 3:00 in the afternoon. She thought she would be aware if Black-mon had purchased beer there 50 times prior to the incident, but she testified on redirect that she had only owned the store for four years (at the time of trial) |inand that she would not know about what happened before she owned the store.
The next defense witness was William Ray Lewis who testified that, on the day of the incident, he was driving Beverly Stewart’s truck and picked up Defendant at his house about 4:30 or 5:00 p.m. The two men went to the store where Defendant bought two cases of beer, two packs of cigarettes and a bag of ice. They then went to the Blackmons’ residence to start working on replacing the engine in Defendant’s truck. They worked on the truck until about 9:00 p.m., when Lewis left.
On cross-examination, Lewis testified that Blackmon was “in and out” with friends during the time Lewis and Defendant worked on the truck, and that Defendant never left while Lewis was there. Blackmon was drinking at the residence, which was several miles outside Baskin. On redirect, Lewis stated that he did not know what happened after he left the Blackmon residence.
Fred Laing was then recalled as a witness. He testified that he interviewed Ma-riah Adams and she did not refer to any conversation with Defendant at the time of the incident and stated, “That he just stared at her.” When Laing was then asked if he specifically “asked her about those things,” he responded in the affirmative. He also testified that Crystal Phillips did not tell him that Defendant had any conversation with her other than responding in the negative when she asked if Blackmon and Defendant were to be checked out together. Laing again admitted that he never spoke to Defendant about the incident. Laing’s testimony on *358 direct ended with [usóme largely irrelevant questions about seeing Blackmon at a birthday party at a restaurant where La-ing and his wife were present, suspecting Blackmon was drinking beer and informing the owner, but not doing anything further.
The last witness to testify was Defendant, who stated that the Baskin police department consisted of two part-time officers, one full-time officer and himself. He testified that, on the day of the incident, he followed his usual routine. He got up about 5:00 a.m., got ready for work, made the rounds and then went to Stewart’s convenience store, in uniform, to “drink coffee with other people and talk, carry on.” He got off work about 5:00 p.m. and changed clothes because he knew he was going to go to the shop at the Blackmons’ residence to work on his truck. He testified that Billy Ray (Lewis) picked him up, and they went across to the convenience store where he (Defendant) walked in and bought two cases of beer, two packs of cigarettes and a bag of ice. They then went to the Blackmons’ residence where one of the cases of beer was for those working on the truck and the other case and a pack of cigarettes for Ms. Verna Blackmon.
He further testified that they worked on the truck about three and one-half hours and finished about 9:00 p.m. After talking to Ms. Blackmon for a few minutes, he got Blackmon to take him home, but on the way, they stopped by Stewart’s where Defendant walked in and got a case of beer. As Defendant was exiting the store, Black-mon went in and Defendant testified that he thought he was getting cigarettes. He confirmed Blackmon’s testimony about where Blackmon parked his truck. He further testified that it was dark outside when he bought the beer and he went and sat in the truck |12until Blackmon came out. According to Defendant’s testimony, when Blackmon got into the truck, he did not have any beer in his hands. He denied indicating to anyone in the store that they should sell beer to Blackmon or staring the clerk down. Defendant further testified that he had never seen Blackmon purchase alcohol and that he never bought alcohol for Blackmon. He testified that he drank Bud Light, but never bought wine coolers or vodka. Defendant concluded his direct testimony by admitting to having a couple of DWI convictions before becoming Chief of Police, and he disputed the testimony of Adams to the contrary.
On cross-examination, Defendant testified that he did not know Blackmon’s age in September 2005, but he further testified that he had seen Blackmon around Baskin, but had never asked him his age. He testified that he had known Blackmon since 2005. At trial, he was reminded that he was at Blackmon’s house on the day of the incident, working at the shop, and again was asked if he had any idea of how old Blackmon was; he replied, “I don’t go around asking people how old they are.” He admitted that Blackmon’s mother was his friend, that Blackmon was a friend and that he had kept Blackmon’s truck for a week and that Blackmon had borrowed his truck in the past. He admitted that Blackmon probably was drinking at the shop that day, but he had not seen him drinking. He further testified that he did not talk to Laing until after he was arrested and he pointed out that he drove himself to the courthouse to turn himself in.
When asked if he was aware it was illegal for Stewart or anybody to sell alcohol to persons under 21, Defendant testified that he had never seen lósales to anyone under 21, but he knew it was illegal. Furthermore, he testified that, if he had seen an illegal purchase taking place, he would have reported it. He further *359 testified that he had heard about Black-mon buying the beer the next day, had talked to him about it and that Blackmon said he bought it from Mariah Adams. Defendant did not, however, give him a citation because he did not see the purchase take place. Defendant also had asked Adams if she had sold Blackmon beer and she replied, “Yes, I’ve sold him beer before.” Defendant responded affirmatively when asked if he would have intervened, whether or not he had his uniform on, if he had gone into the store and had seen Blackmon buying alcohol and knew that Blackmon was 19.
Defendant admitted prior convictions, including DWIs, disturbing the peace in 2004 and issuing worthless checks in 1995. He did not deny, but did not remember, a simple criminal damage to property in 1995 or a simple battery in 1987. The trial concluded and, as previously stated, Defendant was found guilty by a six-person jury and was sentenced to imprisonment for three years at hard labor. This appeal ensued.
DISCUSSION
Assignment of Error Number One (verbatim): Whether the trial judge erred in denying defendant’s Motion for Judgment of Acquittal when State of Louisiana presented no evidence establishing a specific legal duty upon a law enforcement officer to constitute a violation of R.S. 14:134.
Defendant’s argument, although citing the jurisprudence on standards for sufficiency of evidence, essentially relies on the principle that, before a public official can be convicted of malfeasance in office, there must be a statute or provision of the law which delineates an affirmative duty upon the 114official and that the duty must be expressly imposed by law because the official is entitled to know exactly what conduct is expected of him in his official capacity and what conduct will subject him to criminal charges. Defendant then argues that neither La. R.S. 14:93.11(A) (unlawful sales to persons under 21) nor La. R.S. 14:93.12(A) (unlawful purchase or possession by person under 21) are directed to public officers, but are merely general criminal statutes applicable to all members of society. Defendant asserts that, if the law were read to find a specific duty in this case, it would lead to absurd consequences because relatively minor offenses like traffic citations, zoning violations and unkept property, when committed by a public official, would subject the public official to criminal prosecution for malfeasance in office. Defendant also asserts that he had to be acting in his official capacity and that there was no testimony indicating that he was acting as chief of police at the time.
The State argues that, as the chief law enforcement official for the location where the offense occurred, it would seem self-evident that the Chief of Police has the duty to uphold the criminal statutes of the State of Louisiana and that Defendant not only failed to uphold the laws, but participated in and directed the violation. According to the State, the evidence established that Defendant was a principal to the offense of unlawful sales to persons under 21 and/or the purchase and public possession of alcoholic beverages. The State also argues that Defendant executed an oath of office in which he promised to support the constitution and laws of this state and to faithfully and impartially discharge and perform 11sall the duties incumbent on the Chief of Police. The State asserts that the case law and common sense dictate that a police officer acting in his official capacity, who willfully violates a criminal statute, is guilty of malfeasance. The State also asserts that, while Defendant was not in uniform, “it is clear that the Chief of Police in a town the size of *360 Bastón, Louisiana, is never really off-duty,” and that Defendant did not just witness Blackmon’s alcohol purchase, but participated in it.
When issues are raised on appeal, both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App. 2d Cir.8/29/02), 827 So.2d 488, writ denied, 02-2634 (La.9/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La.App. 2d Cir.9/18/02), 828 So.2d 622, writs denied, 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
La. R.S. 14:134 provides in pertinent part:
Malfeasance in office is committed when any public officer or public employee shall:
(1) Intentionally refuse or fail to perform any duty lawfully required of him, as such officer or employee; or
| i7(2) Intentionally perform any such duty in an unlawful manner.
La. R.S. 14:93.11 provides:
A. Unlawful sales to persons under twenty-one is the selling or otherwise delivering for value of any alcoholic beverage to any person under twenty-one years of age unless such person is the lawful owner or lawful employee of an establishment to which the sale is being made and is accepting such delivery pursuant to such ownership or employment. Lack of knowledge of the person’s age shall not be a defense.
*361 B. Whoever violates the provisions of this Section shall be fined not less than five hundred dollars nor more than one thousand dollars or imprisoned for not less than thirty days nor more than six months, or both.
La. R.S. 14:93.12 provides in pertinent part:
A. It is unlawful for any person under twenty-one years of age to purchase or have public possession of any alcoholic beverage.
B. (1) Whoever violates the provisions of this Section shall be fined not more than one hundred dollars or imprisoned for not more than six months, or both.
La. R.S. 33:423(A) provides in pertinent part:
A. The marshal shall be the chief of police and shall be ex officio a constable. He shall have general responsibility for law enforcement in the municipality, and shall be charged with the enforcement of all ordinances within the municipality and all applicable state laws. He shall perform all other duties required of him by ordinance.
In State v. Perez, 464 So.2d 737 (La.1985), a district attorney and district judge were charged with malfeasance and conspiracy to commit malfeasance. The Supreme Court noted that the phrase in the malfeasance statute upon which the court’s opinion hinged was “any duty lawfully | ^required of him.” The court stated that, before a public official can be charged with malfeasance in office, there must be a statute or provision of the law which delineates an affirmative duty upon the official, and the duty must be expressly imposed by law upon the official because the official is entitled to know exactly what conduct is expected of him in his official capacity and what conduct will subject him to criminal charges. The court went on to say:
The district attorney and the trial judge swore in their oath of office to “support the constitution and laws of this state” and to “faithfully and impartially discharge and perform all the duties incumbent [upon them as public officials]”. La. Const. art. 10, § 30. Both public officials have a mandatory duty to conform to the standard of conduct required by that oath. State v. Melerine, 236 La. 881, 109 So.2d 454 (1959). When the defendants swore to uphold the laws of Louisiana, this oath imposed a specific duty upon them not to obstruct or interfere with the execution of those laws. To intentionally interfere with the execution of any law would be a failure to perform a duty lawfully required of them under their oath and would constitute malfeasance.
The court, however, held that the bill of information charging the defendants with failure to inform the grand jury of its right to review its early dismissal and charging them with filing criminal charges against the grand jury foreman in bad faith and without probable cause, did not state a charge of malfeasance because there was no affirmative duty inherent in the office of district attorney to inform the grand jury of its right of review when prematurely discharged, and there is no provision of law defining or limiting the type of case that a district attorney may prosecute. On the other hand, the court, with two dissents, found that the defendants’ oath of office imposed upon them an affirmative duty not to interfere with or prevent the 118grand jury from performing its duties; thus, the defendants’ false representations and premature discharge of the grand jury violated that duty.
In State v. Coker, 625 So.2d 190 (La.App. 3d Cir.1993), writ denied, 624 So.2d *362 1204 (La.1993), the Chief of Police of the town of Glenmora was charged with malfeasance in office as the result of battering prisoners. The defendant contended that a public official can never be convicted of malfeasance unless a specific criminal statute exists which defines the conduct as malfeasance. The defendant further contended that he could not be found guilty of malfeasance for battering the prisoners unless a statute existed that required law enforcement officials to ensure the safety, health and well being of all citizens or persons in their presence or custody and to ensure no batteries were committed upon them. The appellate court concluded that such a requirement would render the offense of malfeasance meaningless and unenforceable because, utilizing the defendant’s reasoning, “every conceivable function and duty of a public official would have to be specifically included in a prohibitory statute in order to successfully ‘notify’ the official of his potential liability for malfeasance.” The court stated that this was clearly impossible in practice and was obviously not the intent of the legislature when enacting the malfeasance statute.
In Coker, the State had noted several statutory mandates, including that found in La. R.S. 33:423, supra, allegedly violated by the defendant’s battery. The defendant argued that none of the statutes could be considered because they were not specifically included in the indictment or bill of |2ninformation as the source of the alleged duty not to batter prisoners. The court held that such specific pleading is unnecessary.
Additionally, the court made the following statements:
We reject the defendant’s contention that affirming the trial court’s finding will subject police officers to criminal malfeasance prosecutions for all violations of the law. Clearly, the malfeasance statute requires that the offender be acting in his official capacity and engaged in the performance of a duty which is required by law, in order to support conviction. The jurisprudence indicates that prosecution for malfeasance is reserved for those cases in which a public official has blatantly abused the authority of his office and violated the public trust by his direct, personal acts or failure to act.
Without question, the defendant’s unprovoked and unjustified attack on these two helpless suspects constituted one of the most flagrant abuses of police authority conceivable. The chiefs conduct, in full view of his subordinates, demonstrated a fundamental disrespect for the constitutional rights enjoyed by our citizens, and set a potentially-dangerous and wholly unacceptable example to other department personnel.
Defendant’s argument regarding the State’s failure to point out an affirmative duty on his part lacks merit. Under the provisions of La. R.S. 33:423, Defendant had an affirmative, statutorily mandated duty to enforce all ordinances within the municipality and all applicable state laws. Thus, viewing the evidence in the light most favorable to the prosecution, Defendant violated that statutory duty by knowingly failing to stop, or by actually encouraging or directing, illegal acts in his presence and within the municipality. Note that any relevant oath of office issues are discussed infra.
We note, however, that, in Coker, supra, the court did conclude that the malfeasance statute requires the offender to be acting in his official capacity and engaged in the performance of a duty, which is required by |ailaw, in order to support conviction. Defendant testified, and the two clerks working at the store that night both agreed, that he was off duty and not *363 in uniform. We find critical, however, that Defendant’s actions amounted to an intentional, if not premeditated, coercion of illegal activity through intimidation. The clerks knew he was the Chief of Police, even though he was off duty, and we find it to be a reasonable conclusion that they would not have sold Blackmon alcohol if an adult who was not a law enforcement officer had taken the same actions as Defendant.
We further find that the record sufficiently supports the finding that Defendant was aware that Blackmon was under the legal age to purchase alcoholic beverages, as evidenced by the quoted testimony of Blackmon, supra. Under the Jackson v. Virginia standard, we find the State’s proof in the case sub jtidice to be sufficient to support the conviction of malfeasance in office.
Assignment of Error Number Two (verbatim): Whether the trial court erred in finding that the defendant’s oath of office created a sufficient affirmative duty to establish a violation of R.S. 14:134.
Assignment of Error Number Three (verbatim): Whether the trial court erred in admitting the defendant’s oath of office when it had not been produced prior to trial.
These assignments are considered together because they both concern the oath of office taken by Defendant. Our discussion in the previous section of this opinion addresses the affirmative duty imposed on Defendant by La. R.S. 33:423(A); and, therefore, we need not address them here. We note, however, that the above-quoted language from State v. Perez, supra, shows that the Louisiana Supreme Court concluded that the district ^¿attorney's and the judge’s intentional interference with the execution of any law would be a failure to perform a duty lawfully required of them under their oath and would constitute malfeasance. Furthermore, in State v. Coker, supra, the defendant made the same argument as Defendant herein that the trial court erred in admitting the Chief of Police’s signed oath of office where the State did not provide the oath of office in response to the defendant’s discovery request. The appellate court concluded, among other things, that the defendant in Coker suffered no prejudice, could not claim surprise at the existence of a document which he personally signed and that defense counsel failed to support his claim that he would have conducted the defense in a different manner.
Assignments two and three lack merit.
Assignment of Errw Number Four (verbatim): Whether the trial court erred in admitting the testimony of a witness who had not been disclosed in discovery or for whom a criminal history had not been provided.
Defendant complains that Haywood was allowed to testify on behalf of the State, over Defendant’s objection, even though no criminal history on Haywood had been provided to Defendant by the State. Defendant further argues that, as a result, Defendant was prejudiced in the cross-examination of the witness.
The State argues that Defendant never established, or even attempted to establish, that Haywood had a criminal history and Defendant did not establish that he was prejudiced in any way in his ability to cross-examine. The State also asserts in a footnote that Haywood does not have a criminal history. Finally, the State asserts that Haywood was not discovered until [¿¿shortly before trial, that the State told the jury in its opening statement that it would use Haywood’s testimony and that, because Haywood did not provide any exculpatory evidence and the defense did not establish any impeachment evidence *364 withheld by the State, there were no grounds for exclusion of the testimony.
Under La. C.E. art. 103, error may not be predicated on a ruling that admits evidence unless a substantial right of the party is affected and a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection.
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La. C. Cr. P. art. 841; State v. Smith, 39,698 (La.App. 2d Cir.6/29/05), 907 So.2d 192.
A mere statement of an assignment of error in a brief does not constitute briefing of the assignment; and, therefore, the assignment is deemed abandoned. State v. Lee, 39,969 (La.App. 2d Cir.8/17/05), 909 So.2d 672, writ denied, 06-0247 (La.9/1/06), 936 So.2d 195; State v. Toney, 26,711 (La.App. 2d Cir.3/1/95), 651 So.2d 387. See also URCA Rule 2-12.4.
The record shows that, when Haywood was called as a witness, counsel approached the bench for a short conference with the court. There is nothing there to show that an objection was made, and the jury then heard Haywood’s testimony. After both sides had rested their case and the jury was removed, however, counsel for Defendant stated, “Misean Haywood, that I forgot to put on the record yesterday concerning discovery violation, | g4no— her name was contained nowhere and no criminal history on her was provided.” The court replied, “Okay. That’s correct. And I’m going to overrule that, but let the objection be noted.”
Apparently, an objection may have been made at the bench conference, although the record does not clearly reflect it. In any event, the only argument made on appeal in this regard pertains to the failure to provide a criminal history for the witness, not the calling of a witness that had not been disclosed by discovery, despite the clear wording of the assignment of error. We find that the State correctly pointed out that Defendant never even attempted to establish that Haywood had a criminal history, and we further note that the State asserts that she had no such history. Moreover, Defendant does not allege on appeal that she had a criminal history.
Our conclusion is two-fold. First, Defendant’s counsel should have objected on the record at the time Haywood was called and not have waited to argue the matter after both sides had rested. Second, even then Defendant’s counsel never attempted to show that Haywood had a criminal history or to show how he was prejudiced in his cross-examination of Haywood. This assignment of error is meritless.
CONCLUSION
For the foregoing reasons, the conviction of Defendant, Tommy Hendry, is affirmed.
AFFIRMED.

. Presumably, the "big man” was Defendant.

. Blackmon was on probation for insurance fraud and he was given a three-year sentence, put on probation for three years and given an $11,000 fine.