Judgment rendered September 22, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,028-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

JAMES DANIEL JOHNSON                        Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 333,389

Honorable Charles G. Tutt, Judge

* * * * *

STEPHEN A. GLASSELL                     Counsel for Appellant

JEFFREY M. LANDRY                       Counsel for Appellee
Attorney General

MADELEINE SLAUGHTER-YOUNG
CHRISTOPHER N. WALTERS
GRANT L. WILLIS
Assistant Attorneys General

* * * * *

Before PITMAN, GARRETT, and THOMPSON, JJ.

THOMPSON, J., concurs with written reasons.

**PITMAN, J**.

A jury found Defendant James Daniel Johnson guilty as charged of molestation of a juvenile, and the trial court sentenced him to five years at hard labor. Defendant appeals his conviction and sentence. For the following reasons, we affirm Defendant's conviction and sentence.

**FACTS**

On September 14, 2015, the state filed a bill of information charging Defendant with one count of molestation of a juvenile with control or supervision, in violation of La. R.S. 14:81.2(A) and (C). It alleged that on or about April 17, 2003, Defendant, whose date of birth is November 15, 1959, committed lewd and lascivious acts upon or in the presence of S.M., whose date of birth is March 19, 1990. Following the recusal of the Caddo Parish District Attorney's Office, the state, through the attorney general's office, filed an amended bill of information, alleging that the molestation occurred on or about April 16, 2003.

On September 18, 2015, the state filed a motion to disqualify Paul Carmouche as defense counsel. It argued that when the alleged molestation occurred in April 2003, Carmouche was the Caddo Parish District Attorney; and, at that time, the district attorney's office rejected S.M.'s claims for insufficient evidence. The state noted that in 2015, the district attorney's office charged Defendant with the same offense that, under Carmouche, it rejected in 2003.

Defendant filed a response and requested that the trial court deny the motion. He stated that there was no conflict because Carmouche never represented S.M. or her family and because S.M. was never a client of the district attorney's office. He explained that the district attorney represents

the interests of the State of Louisiana, not the victim in the criminal action. He argued that there was no evidence that Carmouche had contact with S.M. or had access to any evidence brought forth in 2003.

A hearing was held on September 28, 2015, and the trial court disqualified Carmouche from representing Defendant.

A jury trial began on December 3, 2019. Christine Philipbar, S.M.'s mother, testified that she and Defendant married when S.M. was six years old. In April 2003, she, S.M. and Defendant lived together; and, due to her work schedule as a nurse, Defendant watched S.M. for a few hours during the day. On April 16, 2003, Defendant picked up 13-year-old S.M. from school while Philipbar was at work. When she returned home, S.M. was outside waiting for her and was crying. S.M. told her that Defendant inappropriately touched her "privates" while she was sitting on the couch. S.M. told her that Defendant thought she was asleep and then lifted her shirt and put his hands and mouth on her breasts and vagina. After taking S.M. to a family member's house, Philipbar confronted Defendant. She then brought S.M. home, and they talked to Defendant. Philipbar testified that Defendant did not "come right out and say" that he inappropriately touched S.M., but he did say that S.M. "did the right thing by telling [her] because it would have gotten worse." Philipbar, who at the time was in training to become a sexual assault nurse examiner, stated that she did not examine S.M., take her to the emergency room or contact law enforcement. She allowed S.M. to shower because she felt dirty. The next day she took S.M. to see Shelly Booker, a counselor with whom S.M. had been meeting, and Booker contacted Child Protective Services. A few weeks after the alleged molestation, S.M. was interviewed at the Gingerbread House and was

2

examined at the Cara Center. Philipbar subsequently divorced Defendant. She stated that the district attorney's office did not charge Defendant in 2003 and that this case was reopened in 2014 when he moved back to the area from California. On cross-examination, Philipbar testified that S.M. began attending counseling in June 2001 at the age of 11. On an intake form from S.M.'s first appointment, Philipbar wrote that S.M. had a history of "frequent lying, from constant white lies to big lies"; had "anger issues, total loss of control in school"; and was "moody and dramatic, overreacts to minor situations."

Detective Dennis Pratt of the Shreveport Police Department testified that in April 2003, he supervised this investigation. He stated that the detective assigned to the case set up S.M.'s interview with the Gingerbread House and physical examination with the Cara Center. The report from the Cara Center stated that S.M.'s hymen was intact, there was no evidence of physical abuse and S.M. did not spontaneously disclose abuse during the examination. Det. Pratt later interviewed a second possible victim, Wendy Hartley, who alleged that when she was a minor, Defendant gave her an extra-long hug, tried to kiss her on the lips and rubbed her stomach just below her breasts.

Wendy Westerman testified that in 2003 she was employed as a forensic interviewer at the Gingerbread House and interviewed S.M. on May 13, 2003. A video of the interview was played for the jury, in which S.M. stated that on the afternoon of April 16, 2003, she was home with Defendant while her mother was at work. She was asleep in the living room and woke up to Defendant with his mouth on her vagina. She explained that he pulled her shorts and underwear to the side. She stated that he also

3

sucked on her breasts and put her hand on his penis on the outside of his clothing. During these actions, she kept her eyes closed to pretend she was sleeping. He then left the room to wash his hands, and when he came back in the room, he put his fingers in her vagina. When her mother got home, she took her to her grandmother's house. Her mother then brought her home and they talked to Defendant about what happened, and Defendant said he was sorry. She stated that this was not the first time Defendant touched her and that in the past he kissed her on the mouth, rubbed her stomach and touched her around her breasts and under her underwear.

Detective Mike Jones of the Shreveport Police Department testified that in 2014, he was assigned to this investigation. He interviewed S.M.; Defendant's first wife, Candie Moore; and Wendy Hartley. He attempted to interview Moore's sister, Suzan Maxwell, but she was not willing to speak to him. In his interview of S.M., she told him that Defendant went to her bedroom and touched her breasts and her vagina and that she felt weird when he hugged her. She also told him that on a trip to Colorado, she shared a bed with Defendant and her mother, with her mother sleeping in the middle, and Defendant licked her breasts during the night. In his interview of Hartley, she told him that when she was 11 or 12 years old, she partnered with Defendant at a ski club and later babysat his sons. She stated that Defendant gave her two-armed hugs, tried kissing her on the cheek and then the mouth, put his hand on her knee and then moved his hand up her leg toward her inner thigh and put his hand on her vagina outside her clothing. In his interview of Moore, she told him that she never saw any inappropriate behavior between Defendant and Hartley or Defendant and Maxwell. Det. Jones prepared an arrest warrant for molestation of a juvenile, and

4

Defendant was arrested in California. He noted that the arrest warrant was not based on any behavior related to Hartley.

S.M. testified that in April 2003 she was 13 years old and lived with her mother and Defendant. She noted incidents regarding Defendant that progressed up to April 2003 when she told her mother. On a trip to Colorado, she shared a hotel room and bed with her mother and Defendant. Her mother slept between her and Defendant; but, during the night, she woke up to Defendant sucking on her breast while her mother slept. She also recalled the April 16, 2003 incident and noted that what she told the Gingerbread House interviewer was accurate. She added that this was the first time Defendant used his mouth on her vagina. She testified that her mother's testimony regarding the events of April 16, 2003, was accurate. Regarding the physical examination at the Cara Center, S.M. stated that no one asked her what happened with Defendant and that she did not offer any information because she was scared. Regarding seeing a counselor, S.M. stated that she did not recall telling lies, but that she was acting out due to the abuse she was experiencing. She recalled being upset in 2003 when the district attorney's office did not charge Defendant. She testified that in 2014, she saw Defendant on Facebook in a picture with his granddaughter, who appeared to be around the age of five. She contacted the child's mother out of concern for the child's safety with Defendant. She testified that she was unaware of Defendant's actions with Hartley and Maxwell and that she learned of their histories from the prosecutor.

Wendy Hartley testified that she first met Defendant at a water ski club when she was around the age of ten, and they partnered to perform acrobatic skills. She also babysat for Defendant's two sons. She stated that

when Defendant drove her home from babysitting, he made her uncomfortable when he hugged her and kissed her on the cheek or lips. She stated that on occasion he put his hands on her breasts or between her legs and that he also put his hands on her vagina on the outside of her clothing. She estimated that she was 15 or 16 when these actions occurred. She noted that she did not tell her parents about Defendant's actions. She stated that she was first contacted by an investigator regarding Defendant in 2003 or 2004 when she was 35, and she gave an interview. She was again contacted in 2014 and gave an interview to Det. Jones in which she provided more details about Defendant's actions than she did in her first interview. She stated that in her early 30s when she was going through a divorce, she stayed with Defendant and Philipbar because she was afraid of her husband.

Suzan Maxwell testified she was 13 or 14 years old when her sister married Defendant in 1974 or 1975. She stated that she was alone with Defendant on occasion and that he did things that made her uncomfortable, including wrestling with her on the floor, kissing her on the lips, pressing himself against her and touching her breasts. She noted that this behavior went on for several years, and she did not tell anyone about it. She testified that when Det. Jones came to her business to speak to her, she did not speak to him and that she did not want to testify at trial because of how it affected her family.

Candie Moore testified that she began dating Defendant when she was 18, they married when she was 19, they had two sons and they divorced after 18 years of marriage. She stated that her sister never complained about anything Defendant did to her or in her presence and that Hartley never told her that she was uncomfortable with Defendant. She testified that she

6

thought Defendant's relationship with Hartley was unusual as he was an adult giving her, a 12- or 13-year-old, so much attention, but she never saw any inappropriate behavior.

The state rested its case, and the defense called its witness. Defendant testified that he has never had any sexual contact with S.M. or anyone underage. He stated that he and Maxwell roughhoused when she was 12 or 13 and he was 16 or 17, but there was nothing sexual about it. He stated that if he kissed her, it was a peck, not an open-mouthed kiss, and it would not have been a regular occurrence. He testified that he met Hartley when she was 10 years old and he was 22 and they were partnered in water skiing doubles. He stated that he did not touch Hartley's breasts or vagina when she was a child, but stated he did hug her and gave her an occasional peck on the cheek. Regarding the allegations made by S.M., he recalled being confronted by Philipbar and denying the actions. He denied touching S.M.'s breasts, touching her vagina, licking her vagina and placing her hand on his penis. Regarding the trip to Colorado, he stated that he did sleep in a bed with Philipbar and S.M., but he denied touching S.M.'s breasts while she slept.

On December 4, 2019, the jury found Defendant guilty as charged of molestation of a juvenile. On January 3, 2020, Defendant filed a motion for new trial and a motion for post-verdict judgment of acquittal. The trial court denied both motions.

A sentencing hearing was held on January 9, 2020. The trial court sentenced Defendant to five years at hard labor. On February 6, 2020, Defendant file a motion for reconsideration of sentence, which the trial court denied.

7

Defendant appeals his conviction and sentence.

## DISCUSSION

### *Disqualification of Defense Counsel*

In his first assignment of error, Defendant argues that the trial court erred in granting the state's motion to disqualify Carmouche as defense counsel. He contends that a defendant has the constitutional right to retain the counsel of his choice and that the state did not present sufficient evidence to support the disqualification of his choice of counsel. He contends that even though Carmouche was the district attorney in 2003, there was no evidence that he had personal or substantial involvement in this case that would impute a conflict of interest and warrant his disqualification.

The state argues that the trial court correctly disqualified Carmouche as defense counsel. It contends that Carmouche had complete authority, control and supervision of the district attorney's office in 2003 when it decided not to prosecute Defendant. It states that Defendant would have had an unfair advantage if, at trial, Carmouche stated that the district attorney's office under his leadership declined to prosecute due to insufficient evidence.

The customary remedy for an alleged conflict of interest is disqualification of the attorney with the conflict. *Walker v. State, Dep't of Transp. & Dev.*, 01-2078 (La. 5/14/02), 817 So. 2d 57. In determining whether a conflict exists, courts often look to the Louisiana Rules of Professional Conduct. *Id.* The ethical rules that regulate attorneys' law practices have the force and effect of substantive law. *Id.* The burden of proving disqualification of an attorney rests on the party making the challenge. *Id.*

8

Rule 1.11(a)(2) of the Louisiana Rules of Professional Conduct states:

> [A] lawyer who has formerly served as a public officer or employee of the government . . . shall not otherwise represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation.

Rule 1.11(e) explains that the term "matter" includes:

> (1) any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties; and
> (2) any other matter covered by the conflict of interest rules of the appropriate government agency.

La. C. Cr. P. art. 61 sets forth the powers and duties of the district attorney and states:

> Subject to the supervision of the attorney general, as provided in Article 62, the district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute.

By operation of his powers and duties as district attorney, Carmouche participated personally and substantially in every criminal prosecution in his district, including the 2003 allegations against Defendant. Therefore, the trial court did not err in disqualifying him as defense counsel.

We note that Defendant did not seek review of the trial court's disqualification of Carmouche at the time of the ruling in September 2015. Further, after Carmouche's disqualification, Defendant hired a number of attorneys of his choice, including Peter Flowers, Marty Stroud, Katherine E. Gilmer and Sarah R. Giglio during district court proceedings and Stephen A. Glassell on appeal.

Accordingly, this assignment of error lacks merit.

9

*Sufficiency of the Evidence*

In his second assignment of error, Defendant argues that the state presented insufficient evidence at trial to sustain a guilty verdict. He notes that the district attorney's office reviewed the evidence in 2003 and 2004 and determined there was insufficient evidence to charge Defendant. He argues that Philipbar's actions immediately after S.M. reported the alleged molestation, i.e., allowing S.M. to shower, resulted in destruction of evidence that may have been favorable to him. He contends that as a nurse who was in training to be a sexual assault nurse examiner, she should have followed her training to preserve DNA evidence. He argues that this is a possible *Brady* violation.

The state argues that it presented sufficient evidence at trial to support Defendant's conviction for molestation of a juvenile. It states that the jury found the state's witnesses to be more credible than Defendant. It contends that the testimony of the state's witnesses shows Defendant's disposition and pattern of behavior toward juvenile females.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Hearold*, 603 So. 2d 731 (La. 1992). *See also* La. C. Cr. P. art. 821. This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517. The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State*

*v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. A reviewing court affords great deference to a trial court's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508.

In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. *State v. Elkins*, 48,972 (La. App. 2 Cir. 4/9/14), 138 So. 3d 769, *writ denied*, 14-0992 (La. 12/8/14), 153 So. 3d 438. This is equally applicable to the testimony of victims of sexual assault. *Id*. Such testimony alone is sufficient even when the state does not introduce medical, scientific or physical evidence to prove the commission of the offense. *Id*.

At the time of the commission of the alleged act of molestation, La. R.S. 14:81.2(A) stated:

> Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense.

Viewing the evidence in the light most favorable to the prosecution, the state presented sufficient evidence at trial for a reasonable jury to convict Defendant of molestation of a juvenile when Defendant had a position of

11

control or supervision over the juvenile. Defendant, whose date of birth is November 15, 1959, was over the age of 17 on April 16, 2003; S.M., whose date of birth is March 19, 1990, was under the age of 17; and there was an age difference of greater than two years between them. As S.M.'s stepfather who was at home with her while her mother was at work, Defendant was in a position of control or supervision over S.M.

At trial, the jury heard S.M.'s testimony and viewed the video of her interview at the Gingerbread House. S.M. stated that Defendant put his mouth on her vagina, sucked on her breasts, put her hand on his penis and put his fingers in her vagina. A rational trier of fact could find that these actions by Defendant were lewd and lascivious acts performed with the intention of arousing or gratifying his sexual desires. The sole testimony of S.M. was sufficient to convict Defendant. The jury clearly chose to accept S.M.'s testimony as more credible than Defendant's. It was within the discretion of the trier of fact to make such a credibility determination, and this court will not disturb this determination on appeal.

Further, Defendant's allegation of a *Brady* violation is misplaced. As explained by the United States Supreme Court in *Strickler v. Greene*, 527 U.S. 263, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999):

> [T]he term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called "*Brady* material"—although, strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

12

*See also State v. Brown*, 15-2001 (La. 2/19/16), 184 So. 3d 1265.  In the case *sub judice*, Defendant has not alleged that the state failed to disclose exculpatory evidence.  Instead, he argues that a witness failed to preserve evidence, which is not a *Brady* violation.

Accordingly, this assignment of error lacks merit.

*Excessive Sentence*

In his third assignment of error, Defendant argues that the trial court imposed an excessive sentence in failing to adequately consider mitigating factors, including his age, work history, lack of a criminal history and the length of time between the incident and conviction.

The state argues that Defendant's sentence is not excessive.  It contends that the trial court detailed its decision, including the aggravating and mitigating circumstances it considered.

Appellate review of sentences for excessiveness is a two-pronged inquiry.  First, the appellate court examines the record to determine if the trial court used the criteria set forth in La. C. Cr. P. art. 894.1.  The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects adequate consideration of the guidelines of the article.  *State v. Smith*, 433 So. 2d 688 (La. 1983); *State v. Davis*, 52,453 (La. App. 2 Cir. 2/27/19), 265 So. 3d 1194; *State v. Boehm*, 51,229 (La. App. 2 Cir. 4/5/17), 217 So. 3d 596.  The court shall state for the record the considerations taken into account and the factual basis therefor in imposing sentence.  La. C. Cr. P. art. 894.1(C).  The goal of La. C. Cr. P. art. 894.1 is an articulation of the factual basis for the sentence, not simply a mechanical compliance with its provisions.  *Davis*, *supra*.  Where the record clearly shows an adequate factual basis for the sentence, resentencing is

unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. *Id.* The defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense and the likelihood of rehabilitation are important elements to consider. *State v. Jones*, 398 So. 2d 1049 (La. 1981); *Davis, supra; Boehm, supra.* There is no requirement that specific matters be given any particular weight at sentencing. *Davis, supra; Boehm, supra.*

Second, a sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *Davis, supra.* A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166; *Boehm, supra.*

A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, a sentence will not be set aside as excessive. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *Davis, supra; Boehm, supra.*

At the time of the commission of the alleged act of molestation, La. R.S. 14:81.2 stated:

> B. Whoever commits the crime of molestation of a juvenile shall be fined not more than five thousand dollars, or imprisoned, with or without hard labor, for not less than one nor more than ten years, or both, provided that the defendant shall not be eligible to have his conviction set aside or his prosecution dismissed in accordance with the provisions of Code of Criminal Procedure Article 893.

C. Whoever commits the crime of molestation of a juvenile when the offender has control or supervision over the juvenile shall be fined not more than ten thousand dollars, or imprisoned, with or without hard labor, for not less than one nor more than fifteen years, or both, provided that the defendant shall not be eligible to have his conviction set aside or his prosecution dismissed in accordance with Code of Criminal Procedure Article 893.

As to the first prong of the excessive-sentence test, the trial court complied with La. C. Cr. P. art. 894.1. At the sentencing hearing, it stated that it reviewed Defendant's sentencing memorandum, which included information about his personal history and letters from his family and friends. The trial court also considered the factors listed in La. C. Cr. P. art. 894.1(A) to determine if it should impose a sentence of imprisonment and found that all three circumstances were applicable. It then examined the aggravating and mitigating circumstances set forth in La. C. Cr. P. art. 894.1(B) and determined that the following factors applied to Defendant's case: 1) that Defendant's conduct during the commission of the offense manifested deliberate cruelty to the victim; 2) that Defendant knew or should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to extreme youth; 3) that Defendant used his position or status to facilitate the commission of the offense; 4) and that the offense resulted in a significant permanent injury to the victim. The trial court determined that none of the mitigating factors applied in this case.

As to the second prong of the excessive-sentence test, the sentence of five years at hard labor is not constitutionally excessive. At the sentencing hearing, the trial court informed Defendant that the sentencing range was one to ten years, which suggests the trial court relied on La. R.S. 14:81.2(B).

As the jury convicted Defendant of molestation of a juvenile when the defendant had control or supervision, the trial court should have sentenced Defendant pursuant to La. R.S. 14:81.2(C), which has a sentencing range of not less than one, nor more than 15 years. Although the trial court did not state the correct sentencing range on the record, nothing in the record suggests that the trial court intended to impose a lenient sentence, and the sentence imposed was within the correct sentencing range. *See State v. Preston*, 47,273 (La. App. 2 Cir. 8/8/12), 103 So. 3d 525. Considering Defendant's molestation of S.M., the sentence imposed by the trial court does not shock the sense of justice, nor is it grossly disproportionate to the severity of the offense. The trial court did not abuse its discretion in sentencing Defendant.

Accordingly, this assignment of error lacks merit.

## CONCLUSION

For the forgoing reasons, we affirm the conviction and sentence of Defendant James Daniel Johnson.

16

**THOMPSON, J., concurring**.

I concur in affirming the conviction of the defendant on the evidence presented and the resulting sentence, and I reach the same result as the majority in denying the relief sought for disqualification of defendant's counsel but on different grounds.

I am prompted to write because although the current matter presents an uncommon set of facts, there still exists a likelihood a similar situation may occur, which could have significant impact on the victims of crime and unnecessarily cost taxpayers for multiple trials. Here, the defendant previously had criminal charges reviewed and screened out by the office of district attorney. Over a decade later and under a different administration, the charges were reconsidered, and the defendant was charged based on the same set of facts from years prior. The defendant sought to hire the former district attorney to represent him against the charges, and the State objected and sought to have the former district attorney disqualified.

After a hearing, the trial court granted the disqualification, and a timely objection was noted on the record, preserving that issue for supervisory review. Four years later, the case proceeded to trial, and the defendant was convicted by a unanimous jury. The defendant appealed his conviction and listed the order by the district court disqualifying the prior district attorney as his defense attorney among the assignments of error.

The majority concluded that there were sufficient grounds to disqualify the former district attorney, considering the broad authority over that office pursuant to La. C. Cr. P. art 61. I disagree. The general rule of statutory construction provides for specific statutes to control over a broader, more general statute on the same subject. When considering the issue of

1

recusal of a former government officer, La. Rules of Prof'l Conduct R. 1.11 ("Rule 1.11"), entitled Special Conflicts of Interest for Former and Current Government Officers and Employees, is controlling. As opposed to the broad authority conferred to a district attorney that could be exercised hypothetically, the specific inquiry provided by Rule 1.11 that determines if recusal is necessary is whether the former government officer actually "*participated personally and substantially as a public officer*" in the matter.

At the recusal hearing in this matter, there was absolutely no evidence presented to support any argument that the former district attorney had personally participated at any level, and certainly not substantially, in the screening of the case during his time in office. I suggest that recusal is specific to the individual and not subject to hypothetical authority. The threshold for recusal in this matter was not met and reversal of the trial court's order would have been proper, *had supervisory review been sought prior to trial.*

It is also the opinion of this writer that even though timely preserved, an objection to disqualification of an attorney should be considered abandoned if the defendant proceeds to trial without seeking supervisory review. The trial court granted the disqualification in this matter on September 28, 2015, and trial did not occur until over four years later, on December 3, 2019. The issue of disqualification was allowed to remain dormant by defendant for years before the trial occurred. The defendant only now asserts the issue in an effort to have his conviction vacated. Justice is not best served by such a procedural policy.

Objections to rulings of the trial court provide it with notice of an alleged irregularity and with the opportunity to make a proper ruling to

2

correct any claimed prejudice against the party alleging the error. *State v. Browning*, 06-929 (La. App. 5 Cir. 4/11/07), 956 So. 2d 65, 72. The alleged prejudice to the defendant would be being forced to proceed to trial without his attorney of choice. If he elects to do just that and not exhaust supervisory review on the issue, then there is no longer an appropriate remedy afforded to him. Seeking supervisory review before the trial provides the opportunity to correct the claimed prejudice actually suffered. If the disqualification is affirmed after exhausting supervisory review, then the defendant could at least plan accordingly with new counsel, as that matter is resolved. Reserving this issue as an assignment of error on appeal after the trial creates an unnecessary risk for significant potential harm and expense.

There has been no allegation by the defendant that he proceeded to trial without competent legal representation, and he has not asserted any ineffective assistance of counsel claims in connection with this matter. Defendant seeks a new trial without any certainty that the attorney he selected beforehand is available or interested. The court lacks the authority to require that a specific attorney represent the defendant. There could be instances in similar situations where the attorney has retired, has limited their practice, can no longer be afforded by the defendant, has become disabled, or even died. There is no remedy available to the court should the defendant prevail in his endeavors, as there can be no mandate requiring the former district attorney in this matter to represent the defendant at a new trial in the future.

The existing statutory authority and jurisprudence does not appear to clearly place any requirement that an objection to a recusal ruling be

3

resolved before trial.  Likewise, there appears to be no prohibition against determining the right has been abandoned.  In these limited factual circumstances, I suggest that when a defendant proceeds to trial without having sought supervisory review of the order granting the disqualification of their attorney of choice, they should be considered to have abandoned their ability to raise the issue on appeal.

Reaching the same ultimate conclusion as the majority, I concur in all other regards for the reasons set forth in the opinion.

**AFFIRMED.**