Judgment rendered November 19, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,468-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                           Plaintiff-Appellee

versus

DONALD E. DANIELS, JR.                       Defendant-Appellant

* * * * *

Appealed from the
Fifth Judicial District Court for the
Parish of Franklin, Louisiana
Trial Court No. 2020-315

Honorable Will Barham, Judge

* * * * *

THE HARVILLE LAW FIRM, LLC            Counsel for
By: Douglas Lee Harville              Defendant-Appellant

KEVIN H. JOHNSON
TREY N. MAGEE

PENNY WISE DOUCIERE                   Counsel for
District Attorney                     Plaintiff-Appellee

CAROLINE HEMPHILL
AMANDA MICHELE WILKINS
Assistant District Attorneys

* * * * *

Before STONE, STEPHENS, and HUNTER, JJ.

**HUNTER, J.**

Defendant, Donald E. Daniels, Jr., was charged by bill of indictment with two counts of aggravated (first degree) rape, in violation of La. R.S. 14:42(A)(4),[1] and one count of molestation of a juvenile under the age of 13, in violation of La. R.S. 14:81.2(A)(1) and (D).  Following a trial, a unanimous jury found defendant guilty as charged.  He was sentenced to serve life in prison without the benefit of probation, parole, or suspension of sentence for each first degree rape conviction and to 99 years without the benefit of probation, parole, or suspension of sentence for the conviction for molestation of a juvenile under the age of 13.  The sentences were ordered to be served consecutively.  For the following reasons, we affirm defendant's convictions and sentences, and we remand this matter with instructions.

## FACTS

Defendant, Donald E. Daniels, Jr., is the biological father of the victims, D.D. and J.D.  He is the stepfather of the victim, T.M.[2]

In November 2013, a teacher at an elementary school in Franklin Parish overheard a disturbing conversation between a 12-year-old girl, T.M., and other students; the teacher reported the conversation to the principal, Terri Shirley.  After speaking to the other students, Ms. Shirley spoke to

---

[1] By Acts 2015, Nos. 184 and 256, the Louisiana legislature amended La. R.S. 14:42 to rename the offense of "aggravated rape" to "first degree rape."  The statute was also amended to add Paragraph E, which provides:

> For all purposes, "aggravated rape" and "first degree rape" mean the offense defined by the provisions of this Section and any reference to the crime of aggravated rape is the same as a reference to the crime of first degree rape. Any act in violation of the provisions of this Section committed on or after August 1, 2015, shall be referred to as "first degree rape."

[2] D.D.'s date of birth is April 11, 2006; J.D.'s date of birth is February 1, 2005; T.M.'s date of birth is January 30, 2001.

T.M. and asked her if she had been molested or "bothered" in any way. T.M. reported that defendant, her stepfather, had "raped" her. Ms. Shirley reported the allegations to the Department of Children and Family Services ("DCFS"), and an investigation ensued.

The following day, T.M. was examined by a pediatrician, Dr. Meade O'Boyle. T.M. reported to Dr. O'Boyle that defendant had been sexually abusing her, and the most recent incident had occurred at the family residence three weeks before she reported the abuse to her principal. The sexual assault examination did not reveal any physical signs of sexual abuse.

A complaint was submitted to the Franklin Parish Sheriff's Office ("FPSO"). During her interview with law enforcement officers, T.M.'s mother, "Christy," stated she did not believe T.M.'s allegations. Christy also expressed her belief that T.M. created the false allegations because she wanted to move to Texas to live with her father. Defendant was also interviewed, and he denied the allegations of sexual abuse. DCFS closed its investigation, and FPSO investigation stalled. Eventually, T.M. moved to Texas to live with her father.

In 2015, defendant's biological children, D.D. and J.D., who have cognitive and developmental disabilities, were living with their mother in Fort Worth, Texas. In March of 2015, the children visited defendant in Franklin Parish during spring break. When they returned to Texas, D.D., who was eight years old, reported to her mother that defendant would remove her clothing, spit on his "weewee," and "stick his weewee" in her "private part," and when he does so, "it hurts to go poo." D.D. also informed her mother that defendant would "spread" her vagina and look at it before putting his penis in her "where [she] poopoos from." D.D.'s mother

2

alerted law enforcement officials and took D.D. to Cook's Children's Hospital in Fort Worth, Texas to be examined. The physical examination did not reveal any physical signs of sexual abuse.

Defendant was interviewed by the FPSO in 2015 regarding D.D.'s allegations. He denied the allegations and told the law enforcement officers that D.D.'s mother made up the allegations because of problems regarding child support. The 2015 investigation was not pursued due to the lack of physical evidence.

By 2019, D.D., J.D., and their mother had moved to Tampa, Florida. D.D. confided in her mother's boyfriend, Barry, that defendant had sexually abused her in the past.[3] D.D. also told Barry that defendant would put his "weewee in her butt," and it caused her to have to go to the bathroom afterwards. In November 2019, D.D. was examined by a forensic examiner, and the physical findings did not support or refute her allegations.

During the 2019 investigation, defendant's son, J.D., was interviewed. J.D. reported that defendant had "stuck his wiener" in J.D.'s "butt." Law enforcement officials in Tampa, Florida contacted Deputy Todd Roberts of the FPSO regarding the allegations that defendant had sexually abused D.D. and J.D. Deputy Roberts also learned of the 2015 investigation of sexual abuse in Fort Worth, Texas involving the allegations made by D.D. Deputy Roberts reviewed the files from the Florida and Texas investigations and learned that both investigations indicated that the acts of sexual abuse

---

[3] D.D. also told the forensic interviewer that her mother's boyfriend paid her $50 to look at her private area, and he rubbed his private parts on her private parts. According to D.D.'s mother, she and her then-boyfriend merely wanted to examine D.D. to see if there were any physical signs of sexual abuse. The allegations regarding the mother's boyfriend are not at issue in this case.

occurred in Franklin Parish. He also reviewed the 2013 investigation into T.M.'s complaint. During the course of the investigation, Deputy Roberts reviewed the forensic interviews of T.M., D.D., and J.D. and noted that the similarities between the interviews were "very striking."

Again, defendant was interviewed by the FPSO. He denied the allegations, and he stated this ex-wife was "coaching" D.D. and J.D. to make false accusations against him.

By this time, T.M. had returned to Franklin Parish, and initially, she declined to be interviewed by law enforcement officers. However, T.M. later agreed to be interviewed, and she recanted the claims she made in 2013. Subsequently, after T.M. moved back to Texas, she contacted Deputy Roberts and informed him that she was ready to "tell the truth." She reiterated the allegations she made in 2013, telling Deputy Roberts that defendant anally raped and molested her over the course of approximately two years, and the acts occurred when she was 10 to 12 years old. T.M. also stated the incidents took place in her mother's bedroom, her bedroom, and at "the tattoo shop." T.M. further stated defendant vaginally raped her when she was 12 years old, and she was afraid to report the abuse because defendant had threatened to kill her.

The FPSO completed its investigation and turned the case over to the District Attorney's Office. Ultimately, the matter was presented to a grand jury. Thereafter, the grand jury returned a bill of indictment, charging defendant with two counts of first degree rape (involving D.D. and J.D.), in violation of La. R.S. 14:42(A)(4), and one count of molestation of a juvenile under the age of 13 (involving T.M.), in violation of La. R.S. 14:81.2(A)(1) and (D).

4

During the trial, T.M., D.D., and J.D. testified regarding the sexual abuse perpetrated by defendant, and law enforcement officers testified as to the investigations. Expert witnesses also testified as to why child victims of sexual abuse often recant their allegations, and why it is rare to find physical signs of sexual abuse in child victims.

A unanimous jury found defendant guilty as charged. He was sentenced to serve life in prison without the benefit of probation, parole, or suspension of sentence for each first degree rape conviction and to 99 years without the benefit of probation, parole, or suspension of sentence for the conviction for molestation of a juvenile under the age of 13. The court ordered the sentences to run consecutively, "given the fact that these involve three different victims." Defendant did not file a motion to reconsider sentence.

Defendant appeals.

## DISCUSSION

Defendant contends the evidence was insufficient to support his convictions. He argues there was no physical, medical, scientific, or any other "reliable evidence" to substantiate the victims' testimony. According to defendant, T.M.'s testimony lacked factual support, was not credible regarding the extent of the alleged abuse, and she retracted the allegations she made in 2013. Moreover, defendant argues that D.D.'s and J.D.'s testimony was not supported by any physical evidence, and their testimony was "result-driven based on their mother's needs . . . to keep her lover safe from criminal charges related to his alleged molestation of D.D."[4]

_____

[4] D.D. reported to law enforcement officers that Barry "did the same thing that my daddy did," and during her forensic interview she reported acts of molestation perpetrated

5

Defendant maintains there is uncontroverted evidence that D.D.'s and J.D.'s mother coached them to make allegations against him, and "any reasonable trier of fact would have to reject not only their testimony, but also all other testimony based on, arising from, or related to their inconsistent and incredible claims."

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now codified in La. C. Cr. P. art. 821, does not afford the appellate court with a means to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Johnson*, 55,254 (La. App. 2 Cir. 8/9/23), 370 So. 3d 91.

Appellate courts neither assess the credibility of witnesses nor reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. Rather, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So. 2d 422. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the

---

by Barry. As noted by the trial court, "The acts alleged against Barry were committed in Tampa, Florida, and therefore, jurisdiction for that offense is in Florida."

6

weight of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writ denied*, 02-2595 (La. 3/28/03), 849 So. 2d 566, *writ denied*, 02-2997 (La. 6/27/03), 847 So. 2d 1255, *cert denied*, 540 U.S. 1185, 124 S. Ct. 1404, 158 L. Ed 2d 90 (2004).

Pursuant to La. R.S. 14:41, rape is defined as the act of anal, oral, or vaginal sexual intercourse with a person committed without the person's lawful consent. At the time the offenses were committed, La. R.S. 14:42(A)(4) provided as follows:

> Aggravated rape is a rape committed *** where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed *** when the victim is under the age of thirteen years.

Thus, in order to convict defendant of aggravated rape of a child under the age of 13, the State was required to prove, beyond a reasonable doubt that (1) the defendant engaged in anal, oral, or vaginal intercourse deemed to be without consent of the victim because (2) the victim was less than 13 years of age at the time of the rape. *State v. Lewis*, 50,546 (La. App. 2 Cir. 5/4/16), 195 So. 3d 495, *writ denied*, 16-1052 (La. 5/1/17), 219 So. 3d 330; *State v. Ricks*, 49,609 (La. App. 2 Cir. 1/14/15), 194 So. 3d 614.

In the instant case, the ages of the victims at the time of the offenses are not in dispute. During the trial, D.D., who by then was 16 years old, testified that she and her brother, J.D., visited defendant in Franklin Parish during school breaks. D.D. referred to defendant's penis as his "weewee."[5] She stated defendant would take her into the bedroom he shared with "Ms. Christy," remove their clothing, spit on his weewee, and "stick his weewee

---

[5] The record showed D.D.'s intellectual function is that of a 10-12-year old child.

7

in [her] private part." According to D.D., defendant told her his actions "would help [her] pee and poop better." She described defendant's actions as "weird," and she stated he made her feel "weird." D.D. also testified she did not tell anyone because she "just didn't know what to do." She stated that she told her "birth mother" when she got older, and her mother told defendant to "stop."[6] D.D. testified that defendant stopped "for a few weeks" or "a month," but he later resumed sexually abusing her. As stated above, D.D. has developmental and cognitive disabilities, and she was unable to recall when the acts occurred.[7] She was also unable to recall how many times defendant sexually abused her; she stated the acts occurred "most of my life." D.D. further testified that she knows the difference between a lie and the truth, and her birth mother did not tell her to lie or make up the allegations. She stated that she loves her birth dad, and she would not lie about him or the things he did to her.

By the time defendant's trial took place, J.D. was 18 years old, and he testified via closed circuit television.[8] During his testimony, J.D. recognized

---

[6] By the time the trial took place, D.D. and J.D. had been removed from their mother's custody. During their testimony, they referred to their biological mother as their "birth mother" and to defendant as their "birth father" or "birth dad."

[7] During the trial in the instant case, defense counsel questioned D.D. regarding Barry's acts of molestation. D.D. stated that Barry did not molest her, and she "accidently" told the officers that he did so because they kept asking her "the same question until I just said something random."

J.D. testified that he knew about the statements that D.D. made about their mother's boyfriend. He also stated that he overheard his mother telling her boyfriend that they would "figure something out" so he (the boyfriend) would not go to jail.

[8] La. R.S. 15:283 provides, in relevant part:

A. On its own motion or on the motion of the attorney for any party, a court may order that the testimony of a protected person who may have been a *** victim of a crime be taken in a room other than the courtroom and be simultaneously televised by closed circuit television to the court and jury[.]

***

8

photographs of the houses in Franklin Parish where he would visit defendant during school breaks.  He stated that he had seen defendant's "private parts," and he referred to defendant's penis as his "wiener."  J.D. also testified that defendant would put "clear medicine" on his hands, his wiener, and J.D.'s

B. The court shall ensure that the protected person cannot see or hear the accused unless such viewing or hearing is requested for purposes of identification. However, the court shall ensure that the accused is afforded the ability to consult with his attorney during the testimony of the protected person.

***

E. For the purposes of this Section, "protected person" means a person who is the victim of a crime or a witness in a criminal prosecution who is either of the following:

(1) Under the age of seventeen years.
(2) Has a developmental disability as defined in R.S. 28:451.2[11].

Further, La. R.S. 28:451.2(11) provides:

"Developmental disability" means either:

(a) A severe, chronic disability of a person that:

(i) Is attributable to an intellectual or physical impairment or combination of intellectual and physical impairments.
(ii) Is manifested before the person reaches age twenty-two.
(iii) Is likely to continue indefinitely.
(iv) Results in substantial functional limitations in three or more of the following areas of major life activity:
(aa) Self-care.
(bb) Receptive and expressive language.
(cc) Learning.
(dd) Mobility.
(ee) Self-direction.
(ff) Capacity for independent living.
(gg) Economic self-sufficiency.
(v) Is not attributed solely to mental illness.
(vi) Reflects the person's need for a combination and sequence of special, interdisciplinary, or generic care, treatment, or other services which are of lifelong or extended duration and are individually planned and coordinated.

(b) A substantial developmental delay or specific congenital or acquired condition in a person from birth through age nine which, without services and support, has a high probability of resulting in those criteria in Subparagraph (a) of this Paragraph later in life that may be considered to be a developmental disability.

"butt," and then stick "his wiener in my butt." According to J.D., he would tell defendant to stop, but defendant told him it was "medicine," and he was performing the acts to help J.D. "use the restroom." J.D. testified that defendant penetrated his anus with his penis "two or three" times. J.D. stated that he knew the difference between the truth and a lie, and he confirmed that he loved defendant, but he "didn't like what he did."

Alexis Harrison, a licensed master social worker, was qualified as an expert in forensic interviewing. She testified that, as a forensic interviewer, she is a "neutral party," and she does not work for law enforcement, DCFS, the district attorney, or the medical center. She stated she is "highly trained to talk to children utilizing and understanding child dynamics about abuse, family dynamics, [and] child development[.]" Ms. Harrison also testified that over 50 percent of the children she had interviewed had delayed disclosing sexual abuse, and some children will recant the allegations. She explained that recantations typically occur "when a child is either coached to take it back, maybe they are in fear or afraid of their family breaking apart, they see Social Services getting involved, and they see . . . the gravity of what they've said is potentially causing, or maybe it just didn't happen." She further testified that she was trained to monitor victims of child abuse for signs of coaching.

Ms. Harrison also testified that she conducted D.D.'s forensic interview in March 2015, and only she and D.D. were in the room when the interview occurred.[9] She described D.D. as "very direct" and "adamant that she would not let me say something that wasn't right," which was

---

[9] The videotaped interview was admitted into evidence and played for the jury.

"noteworthy" for a child her age. Ms. Harrison also stated that D.D. "was very direct about her description of the event as it related to her experience regarding how her body felt, what happened after the sexual assault, of what happened to her body when she went to the bathroom," and D.D. "had great details of those sensory experiences that she encountered." When asked whether D.D. exhibited any signs that she had been coached, Ms. Harrison testified as follows:

> I didn't have any indicators of coaching[;] it appeared the description of the events was something she experienced. I know I asked some source monitoring questions, and it appeared this was something that she had experienced and – and been a part of and not something someone told her. And typically, children are told not to say something more than they're ever actually coached to say something.

Ms. Harrison further testified that after rewatching D.D.'s forensic interview, she did not have any concerns that D.D. had been coached.

Stacie Henley, a registered nurse, was accepted as an expert in forensic sexual assault examinations. She testified that there is a "very low" probability of finding physical injuries in prepubescent victims of sexual assault. She explained that anal, genital, and oral tissues heal quickly, and when the abuse is not immediately reported, it is not uncommon to find no signs of physical injury during a physical examination. Ms. Henley testified as follows:

> [O]ne of the things sometimes they don't even outcry right away for many reasons and then that time frame doesn't allow us to see injuries in a timely fashion. But that type of tissue that is in the anal and genital region is a special type of tissue that heals very easily, and it also is the function of like the anus, in particular, is to open up and let large bowel movements come out and so there's often times when we don't see any injury whatsoever, most times. *** Even if it was frequent.

11

She further testified that there is a "less than five percent" probability of finding evidence of vaginal penetration in prepubescent girls.

Ms. Henley stated that she performed D.D.'s sexual assault examination at Cook Children's Hospital in Fort Worth, Texas. She testified that D.D.'s mother accompanied her to the hospital for the examination; however, she interviewed D.D. and her mother separately. She explained D.D. was not in the room when she spoke to her mother, and her mother was not in the room when she spoke to D.D.

Ms. Henley testified that D.D. was eight years old at the time, and her physical examination was "normal." She stated she did not examine D.D.'s cervix or vaginal vault because using a speculum on a prepubertal girl is "a hundred percent not appropriate." According to Ms. Henley, her clinical impression was sexual abuse; however, she did not detect any anal or genital injuries in D.D.

Ms. Henley further testified that during the examination, D.D. was asked whether anyone had ever "hurt her or done something to her," and she documented D.D.'s statements in her medical records as follows:

> Just my daddy, my daddy only use[s] his weewee, he spits on his weewee, it [sic] easier to put in between my private part but it hurts and I don't like it. *** Every time he does it, it makes me pee, and it hurts. He does it a lot every day when I go to Daddy's, a lot of days. [J.D.] only got it done one day. Daddy did it to [J.D.] one day. *** He's trying to think that spit is medicine. He spits on it, his hand and he rubs it on his weewee. He pushes it up and down.

During cross-examination, Ms. Henley was questioned about the lack of physical signs of anal penetration. She testified that if a prepubescent girl was anally raped repeatedly, physical signs of trauma would depend on

12

factors such as lubrication, position, the child's rectal sphincters, and the degree of penetration.

Moreover, Ms. Henley testified that she is trained to look for signs of coaching in child victims of sexual abuse. She stated signs of coaching include being unable to maintain consistency in statements and being unable to provide sensory details of the incidents. Ms. Henley also stated that medical professionals are specially trained to solicit information from child victims without asking leading questions, and children are provided with neutral forensic interviewers who are "able to ask question in a non-leading way and, most importantly, who understand child developmental levels[.]" Ms. Henley testified she did not detect any signs of coaching during her interaction with D.D.

Detective Mark Delmonte, a member of the Special Victims' Unit of the Tampa Police Department in Tampa, Florida, also testified. He stated that most cases of child sexual abuse in Florida are reported through DCFS. Det. Delmonte testified that in October 2019, he was assigned to investigate D.D.'s allegations involving her mother's boyfriend, Barry. He stated that D.D. provided specific details concerning Barry's actions, and during the interview, D.D. stated that what Barry did to her "was okay because it wasn't as bad as what her dad did to her." He testified that based on D.D.'s remarks regarding defendant, he contacted her mother, Lacey, who told him that "this was a misunderstanding and a false allegation and that her daughter had made it up." Det. Delmonte decided to have D.D. examined by a forensic interviewer. He stated he watched D.D.'s forensic interview, and he recognized "obvious signs of coaching" regarding the allegations against

13

Barry.[10]  With regard to the allegations against defendant, Det. Delmonte testified that D.D. did not show any signs that she had been coached.  He explained as follows:

> What struck me about the interview, when she spoke about [defendant] was the specifics that she gave, the nature of the abuse[.] *** The specifics that she gave would be very difficult to teach a child to come up with these statements.
>                                    ***
> Some of the things that she mentioned during the interview about her dad spits on his penis, rubs it in her butt, leans on her, makes the hole bigger, makes her have to go to the bathroom, these are – again I think it would be difficult to teach a child to know these things.
>                                    ***

Det. Delmonte testified that he asked Lacey about D.D.'s allegations against defendant, and Lacey informed him that defendant lived in Louisiana, and she had reported the allegations of sexual abuse "at least once before in another state."  Det. Delmonte also testified that J.D. also reported that defendant had sexually abused him.  According to Det. Delmonte, J.D. stated that defendant "would put clear jelly, medicine, on his penis and insert it in his anus for the purpose of helping him defecate."[11]  Lacey provided Det. Delmonte with defendant's name and date of birth, and he forwarded the information to Det. Roberts in Franklin Parish.

Lacey, D.D.'s and J.D.'s mother, also testified at trial.  She stated she has "learning disabilities," and she was in special education classes in school.  Lacey vehemently denied coaching D.D. and J.D. to accuse

---

[10] Det. Delmonte confronted Lacey with his suspicions that D.D. had been coached, and she "eventually relented and admitted that she had coached [D.D.] to not get Barry in trouble because she was afraid that his probation would be violated."  He also checked Lacey's phone and discovered that Barry had driven her and D.D. to the interview, and Lacey was keeping him updated via text messages during the interview.

[11] Det. Delmonte testified that he did not interview J.D.  Rather, J.D. was interviewed by "the civilian investigators for the Child Protection Investigative Division" of the sheriff's department.

defendant of sexual abuse. She admitted that she signed an affidavit in which she attested that she "falsely accused" defendant of sexual abuse. She stated that the affidavit was drafted and mailed to her by defendant's sister, and she signed it in the presence of a notary without reading it. Lacey testified that she told defendant's sister she was "conflicted" and "didn't know who to believe," and she signed the affidavit because she believed it contained the statements she had made to defendant's sister. The affidavit was introduced into evidence and published to the jury.

Lacey reiterated that she did not persuade D.D. and J.D. to make up the allegations. Lacey testified that in 2015, she and her children were living in Fort Worth, Texas, and D.D. and J.D. visited defendant in Franklin Parish during their spring break. When the children returned home, D.D. told her that defendant "was doing the weewee thing, sticking his weewee in her private part."[12] Lacey stated she called law enforcement and child protective services, and she took D.D. to be interviewed and physically examined; however, the case in Texas was "closed" because D.D.'s physical examination did not reveal any physical signs of abuse.

Lacey further testified that J.D. never disclosed the abuse to her; she learned about the allegations involving J.D. from the detectives in Florida. She also stated that when she and defendant were married, he liked to engage in anal sexual intercourse, and she accommodated his sexual desires. Lacey stated she continued to send the children to Louisiana to visit defendant after the allegations were made in 2015.[13]

---

[12] Lacey also testified that D.D. made "accusations" against Barry to detectives in Florida; however, "nothing was ever founded, and everything was dropped."

[13] Lacey testified that the detectives in Florida told her not to allow the children to be around Barry. Ultimately, in December 2019, D.D. and J.D. were removed from

15

Moreover, Lacey denied defendant's claim that she coerced their children to make the accusations due to a custody dispute. She stated defendant "would always threaten" to take her back to court to revise the custody agreement whenever she "wouldn't give in to his demands when he wanted them." Lacey also testified defendant wanted her to move back to Louisiana with the children, and when she refused to do so, "he would threaten me to take me to Court and take the kids from me." Lacey compromised by moving from Corpus Christi to Fort Worth, Texas to be closer to Louisiana, and thereafter, she and defendant "weren't arguing that much anymore."

Based on the testimony and evidence adduced at trial, we find the State presented sufficient evidence to support defendant's conviction for the aggravated rape of D.D. Despite her cognitive challenges and inability to recall specific dates, D.D. was able to describe, in detail, the times she was sexually violated by defendant in his and "Ms. Christy's" bedroom. The lack of physical evidence that defendant had been sexually abusing D.D. was consistent with the experts' testimony that young children most often will not exhibit physical signs of sexual abuse. Further, D.D. underwent forensic interviews in Texas and Florida, and the expert witnesses testified they did not observe any signs that she had been coached by her mother. Although Det. Delmonte testified that he could observe signs that D.D. had been coached with regards to the allegations against Barry in Florida, he clearly stated that he saw no signs that she had been coached or induced to make false statements regarding defendant. D.D.'s testimony was sufficient to

Lacey's custody because she "kept going around Barry and then [she] sent the kids back to [defendant] after the fact of the initial allegations in 2015.

16

prove defendant's commission of the crime, and it is apparent from the verdict that the jury found D.D.'s testimony to be credible.

Additionally, our review of the trial evidence shows the State met its burden of proving defendant committed the aggravated rape of J.D. It is apparent that J.D. has cognitive limitations and lacked understanding of the meaning of sexual abuse, as during his forensic interview, J.D. stated that defendant did not sexually abuse him. Nonetheless, J.D. informed the interviewer that defendant put "medicine" on his (defendant's) penis and used his penis to insert the medicine into J.D.'s rectum to assist him in using the bathroom. J.D.'s testimony at trial was consistent with the statements he made during his forensic interview. Despite defendant's insistence, there is no evidence that J.D. had been coached. J.D. testified that he knew the difference between the truth and a lie, and he stated he was telling the truth about what defendant did to him. The jury chose to believe J.D.'s testimony, and this Court affords great deference to such credibility determinations.

Notwithstanding counsel's assertions during oral arguments before this Court, Lacey did not testify that she coached D.D. and J.D. During her testimony at trial, Lacey repeatedly denied making up the allegations against defendant. It is undisputed that Lacey signed a sworn statement, in which she attested she had "made up" the allegations against defendant. However, she explained that the document was drafted by defendant's sister, and she (Lacey) signed it without knowing or understanding the contents of it.

Based on this record, the evidence presented overwhelmingly supports defendant's convictions for aggravate rape. This assignment lacks merit.

Defendant also argues the evidence was insufficient to support this conviction for molestation of a juvenile under the age of 13 regarding T.M.

17

According to defendant, T.M.'s testimony lacked factual support and was not credible regarding the extent of the alleged abuse. Defendant also argues that T.M. retracted the allegations she made in 2013, and her statements "depended on what she needed and where she wanted to live at the time." Defendant further asserts that T.M. testified that defendant anally raped her nearly every day over a two-year period, yet her physical examination did not show any physical signs of sexual abuse.

At the time of offenses regarding T.M., November 1, 2011, through November 30, 2013, La. R.S. 14:81.2(A)(1) provided, in relevant part:

> Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense.

During the trial, T.M. testified she was 10 years old when defendant moved into the house occupied by her, her mother, and her brothers. She stated she and her brothers were often left in defendant's care while her mother worked. T.M. testified that the acts of molestation began with defendant touching her over her clothing and escalated over time. T.M. also testified defendant would carry her to the bedroom he shared with her mother, and he would penetrate her anus with his penis. She stated the acts occurred every day after school, when she and defendant were alone in the house, or after her mother went to sleep. She also stated that on some afternoons, she would accompany defendant to "the tattoo shop" where he would penetrate her anus with his penis. T.M. further testified that the last

18

time defendant assaulted her, he attempted to penetrate her vaginally, and she threatened to "tell everyone" about the sexual abuse. T.M. stated that defendant threatened to kill her entire family if she disclosed the abuse, and she believed he would do so.

According to T.M., defendant had "anger issues," and she was afraid to disclose the sexual abuse because she was afraid for her family. She also described behaviors, such as defendant "fighting" with her mother and punching holes in the walls of their home. Additionally, T.M. testified that when she finally disclosed the abuse, her mother did not believe her, and her grandmother told her to stop talking about the sexual abuse because doing so would "tear the family apart and she [T.M.] would be taken away." T.M. explained that she began denying the abuse because defendant was not arrested in 2013, when she initially disclosed the sexual abuse, and she did not have any family support. She stated she went to live with her father, and when she would return to Franklin Parish to visit her mother, she would feel "nervous, worried, and uncomfortable." However, during visits, she was not left alone with defendant. Furthermore, T.M. testified that she believed her mother and grandmother created the lie about her making up the allegations out of a desire to move to Texas with her father, and her mother told her to "stick with the same story" when law enforcement officers reached out to her in 2019.

Moreover, T.M. testified that she was telling the truth about what defendant did to her and she had nothing to gain from lying. She stated, "I'm a twenty-two year old grown woman with two baby girls of my own[.] I have nothing to gain but peace of mind and clarity knowing that justice has been served."

19

Christy, T.M.'s mother, testified that T.M. was often left alone with defendant after school, and T.M. would sometimes "seem upset" after spending time with defendant. Christy also recalled occasions when defendant would leave their bedroom during the night, and she also recollected one occasion when T.M. began to tell her "something" but stopped, stating she did not think her mother would believe her. Cristy further confirmed defendant's proclivity for anal sexual intercourse, and she described it as "his most wanted desire." According to Christy, defendant had expressed to her that if she would not engage in anal intercourse with him, then "he'd get it elsewhere."

Further, Christy testified that defendant was the one who told her that T.M. was making up the allegations of sexual abuse because she wanted to move to Texas to live with her father, and she (Christy) repeated the story to the authorities during the investigation in 2013. Cristy also corroborated T.M.'s testimony regarding defendant's "anger issues." She testified as follows:

> He would punch things, he punched the window pane out of the door, slammed his fist on top of the dresser and broke it one time, he shot a gun off in the bathroom window right next to my older son that was standing there beside him, [and] he would scream, holler, yell, right in front of my face.

Amanda Chapaton, a licensed professional counselor, was accepted as a generalist in traumatic behaviors in sexual abuse victims. She prepared and presented a series of slides which listed common myths in child sexual abuse cases. Ms. Chapaton stated that one common myth is that if a child is being sexually abused, there will be medical evidence. She explained that medical evidence of sexual abuse is usually only obtained in cases where the abuse is reported or discovered as soon as the incident occurred. She also

testified that research has shown that less than five percent of child sexual abuse cases will provide medical evidence. Ms. Chapaton further testified that another common myth pertains to false allegations of sexual abuse. She stated that false allegations are uncommon and only occur in four percent of reported cases. Additionally, she stated one of the biggest myths in child sexual abuse cases is that children usually tell someone when they are being sexually abused. According to Ms. Chapaton, research has found that most child victims delay or never disclose child sexual abuse to friends, family, or authorities. She stated that some children do not disclose sexual abuse because they are afraid, and some children will "partially disclose" the extent of the abuse.

Ms. Chapaton also addressed the issue of why some children recant the allegations, provide inconsistent information, and are reluctant to testify against the offender. She testified as follows:

> [E]vidence of recantations and inconsistencies are common and again the misconception is that it's the opposite, that once I tell, I've decided to tell and there you go. And what we know is that there's reluctance, there's inconsistencies. I may have a lot of motivation to recant. *** Child sexual abuse victims are more likely to recant or have inconsistencies in their story when the abuse is perpetrated by a family – a familiar person, especially family. That feels like it should be common sense but unfortunately it's not. I use the word motivation in saying that the motivation to make things okay is strong, right, with children. They can't just pick up and leave and you know, get in their car and go somewhere else. So often times they want to try to fix it, right. And so there's some variables that will come up for children as far as 'Who is the person to me. I still love the person. I may not want the person to get into trouble even though I don't like what they did.' *** So out of just some common reactions related to sexual abuse, so victims recant in a variety of ways, there's no one size fits all response to sexual abuse. There's no one size fits all response to trauma.
> ***

21

After reviewing this record in its entirety, we find the evidence was sufficient to prove defendant committed the offense of molestation of a juvenile under the age of 13. T.M. was 12 years old when she made the allegations in 2013, and defendant was 36 years old. Thus, it is undisputed that T.M. was under the age of 13, defendant was over the age of 17, and the age difference between T.M. and defendant was more than two years. It is also undisputed that defendant, as T.M.'s stepfather, was in a position of supervision or control over her, and he committed the offenses "with the intention of arousing or gratifying" his sexual desires. T.M.'s testimony, including her statements during her forensic interview, was detailed and consistent. The jury, as the factfinder, reasonably accepted T.M.'s testimony as credible and rejected defendant's denials of wrongdoing.

Based upon the testimony of the victim alone, the jury could reasonably have found that the State proved the essential elements of the crime of molestation of a juvenile beyond a reasonable doubt. Thus, under the *Jackson* standard, the evidence was sufficient to support defendant's conviction for the molestation of T.M.

Further, defendant's argument regarding T.M.'s alleged inconsistent statements and her recantation in 2013 was refuted by the testimony of Ms. Chapaton, who described, in great detail, the reasons many child victims of sexual abuse often provide inconsistent statements and/or recant the allegations. Additionally, defendant's argument concerning the lack of physical evidence of sexual abuse was also repudiated by the testimony of Ms. Henley and Ms. Chapaton. Specifically, Ms. Henley testified that anal and genital tissues heal quickly, and signs of physical injuries are usually

22

absent unless the abuse is immediately reported. This assignment lacks merit.

Defendant also contends the sentences imposed – two sentences of life without the benefit of probation, parole, or suspension of sentence, to be served consecutively with each other and consecutively with the 99-year sentence without benefits – are constitutionally excessive. Although defendant did not file a motion to reconsider sentence, he now argues that the trial court failed to consider factors such as his criminal history, the gravity or dangerousness of the offenses, the viciousness of the crimes, the harm done to the victims, whether defendant constitutes an unusual danger to the public, the potential for defendant's rehabilitation, and whether defendant had received a benefit from a plea bargain.

Defendant also argues he is "a disabled veteran who served his country honorably," and despite his disabled status, he "sought employment, was involved in the church, had sought to make himself a better person and had provided support to his children and to his stepchildren." He maintains the sentences should be vacated because they are grossly disproportionate to the severity of the offenses and constitute nothing more than needless infliction of pain and suffering. Moreover, defendant contends concurrent sentences are warranted because his convictions arise from the same act or transaction and constitute parts of a common scheme or plan.

Generally, an excessive sentence claim is reviewed by examining whether the trial court adequately considered the guidelines established in La. C. Cr. P. art. 894.1 and whether the sentence is constitutionally excessive. *State v. Dowles*, 54,483 (La. App. 2 Cir. 5/25/22), 339 So. 3d 749; *State v. Vanhorn*, 52,583 (La. App. 2 Cir. 4/10/19), 268 So. 3d 357,

*writ denied*, 20-00745 (La. 11/19/19), 282 So. 3d 1065. However, when a defendant fails to timely file a motion to reconsider sentence, the appellate court's review of the sentence is limited to a bare minimum claim of constitutional excessiveness. *State v. Benson*, 53,578 (La. App. 2 Cir. 11/10/20), 305 So. 3d 135.

Defendant, by failing to file a motion to reconsider sentence, has waived his right to have his sentence reviewed for compliance with La. C. Cr. P. art. 894.1. As a result, the sole remaining question in this appeal is whether his sentences exceed the punishment allowed by the state and federal constitutions.

The Eighth Amendment of the United States Constitution and Article I § 20 of the Louisiana Constitution prohibit the imposition of cruel or excessive punishment. Although a sentence falls within statutory limits, it may be excessive. *State v. Sepulvado*, 367 So. 2d 762 (La. 1979). The appellate court must determine if the sentence is constitutionally excessive. *State v. Smith*, 01-2574 (La. 1/14/03), 839 So. 2d 1. To assess a claim that a sentence violates La. Const. art. I § 20, the appellate court must determine if the sentence is grossly disproportionate to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey,* 623 So. 2d 1276 (La. 1993); *State v. Bonanno*, 384 So. 2d 355 (La. 1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166; *State v. Meadows*, 51,843 (La. App. 2 Cir. 1/10/18), 246 So. 3d 639, *writ denied*, 18-0259 (La. 10/29/18), 254 So. 3d 1208.

The sentencing court has wide discretion to impose a sentence within the statutory limits, and the sentence imposed will not be set aside as excessive absent a manifest abuse of that discretion. *State v. Williams*, 03-3514 (La. 12/13/04), 893 So. 2d 7. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Gaines*, 54,383 (La. App. 2 Cir. 2/22/23), 358 So. 3d 194, *writ denied*, 23-00363 (La. 6/21/23), 362 So. 3d 428; *State v. Tubbs*, 52, 417 (La. App. 2 Cir. 11/20/19), 285 So. 3d 536, *writ denied,* 20-00307 (La. 7/31/20), 300 So. 3d 404, *on recons.*, 20-00307 (La. 9/8/20), 301 So. 3d 30, and *writ denied*, 20-00307 (La. 9/8/20), 301 So. 3d 30.

Regarding concurrent and consecutive sentences, La. C. Cr. P. art. 883 provides:

> If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all be served concurrently.

The decision to make sentences consecutive, rather than concurrent, is within the trial court's discretion. *State v. Farria*, 412 So. 2d 577 (La. 1982); *State v. Moss*, 55,454 (La. App. 2 Cir. 1/10/24), 379 So. 3d 285. When the court makes sentences consecutive, it must state the considerations, which may include the defendant's criminal history, the gravity or dangerousness of the offense, the viciousness of the crimes, the harm done to the victims, whether the defendant constitutes an unusual risk of danger to the public, the potential for the defendant's rehabilitation, and whether the defendant has received a benefit from a plea bargain. *State v.*

*Gant*, 54,837 (La. App. 2 Cir. 1/11/23), 354 So. 3d 824; *State v. Dale*, 53,736 (La. App. 2 Cir. 1/13/21), 309 So. 3d 1031.

Whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. La. R.S. 14:42(D). Further, at the time the offenses concerning T.M. were committed, the sentencing range for molestation of a juvenile under the age of 13 was 25-99 years at hard labor, with at least 25 years to be served without the benefit of parole, probation, or suspension of sentence. La. R.S. 14:81.2(D)(1).

The trial court ordered a presentence investigation which it reviewed prior to imposing sentence. The court noted that defendant was a first felony offender but was arrested in 1995 in Texas for misdemeanor theft for which he received six months' probation. The court also reviewed defendant's family and social history and his educational, employment, and military background. The court also noted defendant was 46 years old at the time of sentencing. The court specifically stated that defendant is a veteran of the Gulf War era, and he served in the United States Navy from 2001-2009. Further, the court noted defendant was diagnosed with an unspecified depressive disorder, which caused impaired judgment, impaired abstract thinking, disturbances of motivation and mood, and difficulty in establishing and maintaining effective work and social relationships.

The court also read into the record a letter submitted by T.M., in which she outlined the devastating impact the sexual abuse had on her life. T.M. asserted that what defendant did to her was "the worst thing that could ever happen to a kid," his actions caused physical and emotional damage that will never heal, the sexual abused has changed the way she feels and

interacts with others, and she has permanent "trust issues." T.M. further stated:

> He has damaged our entire family. And if you listen to him talk, he will make you think that he did nothing wrong or that we're all crazy. That's the most hurtful thing, he believes he hasn't done anything wrong. I don't believe that he has the ability to see himself as anything but better than everyone else. He is dangerous to public safety. He needs to spend the rest of his life in jail.

Christy also submitted a statement, expressing her belief that defendant "should get the maximum sentence of life in prison without the possibility of parole." She also stated she "suffered mental, verbal, emotional, and sexual abuse" from defendant, but she was "just too afraid to speak up." Christy also acknowledged that she "failed" T.M. by not believing her allegations in 2013.

In their statement to the court, the adoptive parents of D.D. and J.D. expressed the hardships and the psychological consequences of the sexual abuse inflicted by defendant. The adoptive parents noted that a life sentence was mandatory and requested that the court "allow the severity of the sentence to reflect the severity of the crime."

The court also considered defendant's written statement, in which he acknowledged that he had been convicted of "the worst crimes a person could commit." Defendant requested leniency and asked the court to consider his status as a "model inmate" during his incarceration.

The trial court imposed life sentences for the aggravated rape convictions as mandated by statute, and the maximum sentence, 99 years, for the molestation conviction. The court stated that it was ordering the sentences to run consecutively to one another, "given the fact that these involve three different victims."

We note that in cases involving first-felony offenders, concurrent sentences are ordinarily imposed, particularly where the convictions arise out of the same course of conduct. However, in this case, defendant sexually abused three different victims at varying times. Defendant, as the father of D.D. and J.D., and the stepfather of T.M., was in a position of trust and authority over the victims. Rather than protecting and guiding the young victims, defendant used his position and access to them to prey upon them. Defendant's repeated sexual abuse of D.D., J.D., and T.M. negatively impacted their lives and have caused long-lasting and devastating effects.

Our review of the record shows defendant exhibited no remorse for his actions. When the allegations were asserted by T.M. in 2013, defendant falsely stated that T.M. made the allegations out of a desire to move to Texas to live with her father, and he managed to convince Christy to believe him. Thereafter, when D.D.'s allegations surfaced in 2015, defendant blamed Lacey, and he told law enforcement that the allegations were brought forth due to a non-existent custody dispute. Again, he convinced Christy that D.D.'s allegations were due to a custody dispute, and she expressed the same to law enforcement officials. Throughout the proceedings and on appeal, defendant has maintained his position, and he offered no apology to the victims of his crimes.

We find that the trial court appropriately considered defendant's lack of remorse, the devastating impact the offenses had on the victims, and the fact that defendant sexually abused three young victims. Given the level of the breach of trust involved and the profound negative impact of these offenses on three young victims, we do not find that the trial court abused its discretion in the sentences and the consecutive nature thereof.

28

**ERRORS PATENT**

In accordance with La. C. Cr. P. art. 920, all appeals are reviewed for errors patent on the face of the record. Our review of this record has revealed three errors patent.

First, the trial court failed to specify that the sentences would be served at hard labor, as mandated by the penalty provisions of La. R.S. 14:42 and 14:81.2(D). The failure to impose hard labor is harmless and self-correcting when there is a mandatory felony requiring any sentence to be served at hard labor. *State v. Smith*, 53,827 (La. App. 2 Cir. 3/3/21), 315 So. 3d 407; *State v. Burns*, 53,250 (La. App. 2 Cir. 1/15/20), 290 So. 3d 721; *State v. Thomas*, 52,617 (La. App. 2 Cir. 5/22/19), 272 So. 3d 999, *writ denied*, 19-01045 (La. 2/10/20), 292 So. 3d 61. Because violations of La. R.S. 14:42 and 14:81.2(A)(1) and (D) are mandatory felonies requiring any sentence to be served at hard labor, the error is harmless and self-correcting. Nonetheless, we remand this matter to the trial court to allow the court minutes to be amended to reflect that defendant's sentences shall be served at hard labor.

Next, the trial court ordered defendant's sentences to be served without the benefit of probation, parole, or suspension of sentence. Although the court minutes correctly reflect that the sentences are to be served without benefits, the Uniform Sentencing Commitment Order does not reflect the same. Accordingly, on remand, we order the trial court to issue an amended Commitment Order that correctly reflects defendant's sentences shall be served the without the benefit of probation, parole, or suspension of sentence.

Finally, although the record reveals that the trial court provided defendant with written notice of the sex offender notification and registration requirements, pursuant to La. R.S. 14:542-543.1, the minutes do not reflect that defendant was provided with notice of the sex offender notification requirements. On remand, we instruct the trial court to make an entry in the court minutes stating that the written notification was provided to defendant in accordance with La. R.S. 15:543(A).

**CONCLUSION**

For the reasons stated above, we affirm defendant's convictions and sentences. This matter is remanded to the trial court with instructions to amend the court minutes to reflect that defendant's sentences shall be served at hard labor. We also remand this matter to the trial court to correct and amend the Uniform Order of Commitment to correctly reflect that defendant's sentences shall be served without the benefit of probation, parole, or suspension of sentence; the court is further ordered to send a copy of the amended Commitment Order to the clerk of this court within 45 days of this judgment. Finally, we order the trial court to amend the court minutes to reflect that the written sex offender notification was provided to defendant.

**CONVICTIONS AFFIRMED; SENTENCES AFFIRMED; REMANDED WITH INSTRUCTIONS.**